UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SAMANTHA  SNYDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RODNEY  SMITH, JR, | ) | |
| ELI  SMITH, | ) | |
| TREY  CROCKETT, | ) | |
| DAKOTA  BEARD, | ) | |
| CAIRA  BOLEN, | ) | |
| FRANKFORT POLICE DEPARTMENT, | ) | No. 1:13-cv-00576-SEB-DKL |
| CITY OF FRANKFORT, | ) | |
| JASON  ALBAUGH Detective, | ) | |
| ROBERT  HESSION Detective, | ) | |
| TROY  BACON Chief, | ) | |
| CHRIS  MCBARNES Mayor of Frankfort , | ) | |
| Indiana, | ) | |
| AUTUMN DICK (Added per Second | ) | |
| Amended Complaint of 7/10/13.), | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS

This cause is before the Court on motions to dismiss filed by three groups of defendants.

Defendants Caira Bolden and Christina Bolen filed their Motion to Dismiss for Failure to State a

Claim [Docket No. 46] on August 23, 2013. Defendants Jason Albaugh, Troy Bacon, Robert

Hession, Chris McBarnes, the Frankfort Police Department, and the City of Frankfort

(collectively, the "Frankfort Defendants") filed their Motion to Dismiss Third Amended

Complaint [Docket No. 70] on August 26, 2013. Lastly, Defendant Trey Crockett filed his

Motion to Dismiss for Failure to State a Claim and for Lack of Jurisdiction [Docket No. 77] on

September 16, 2013. For the reasons set forth below, the motions are GRANTED in part and DENIED in part.

## Factual and Procedural Background

### Facts

Plaintiff Samantha Snyder was a resident of Frankfort, Indiana, at the time of the incidents recounted in the Complaint. Compl. ¶ 8.[1] She claims, broadly speaking, that she was victimized in two ways: first, when she suffered a sexual assault, and second, when Frankfort city and police officials failed to respond adequately, allegedly conspiring with some of the perpetrators of the original sexual assault to mishandle the investigation, avoid charging any suspects, mistreat Plaintiff personally, and leave her feeling vulnerable to further assaults.

**The Sexual Assault**

Plaintiff alleges that, while at the home of Defendant Caira Bolen in Frankfort, she was given 8 capsules of Klonopin, an anti-seizure medication that she had never taken before. She took the pills, which have a powerful depressant effect in large doses, in order to "feel better." Compl. ¶¶ 24–25. Plaintiff and Bolen then went to a party at 552 East Washington Street, Frankfort, a house owned by Defendant Eli Smith. *Id.* at ¶ 22.[2] After she had entered the house, Defendants Dakota Beard and Trey Crockett, fellow party-goers, asked her to expose herself, and she refused. Shortly thereafter, Rodney Smith, the son of Eli Smith, who is nicknamed "Boomer," offered her an "unknown substance" to drink; after drinking it, Plaintiff lost consciousness. *Id.* at ¶¶ 27–30.

---

[1] Plaintiff's current allegations are contained in her Third Amended Complaint [Docket No. 63], filed on August 8, 2013, which supersedes her three previous complaints. For the sake of simplicity, we will refer to the Third Amended Complaint as "Complaint" throughout this Order.

[2] Plaintiff refers to Eli Smith as "E. Smith" throughout the complaint and briefs.

When Plaintiff regained consciousness, Defendants Beard, Eli Smith, Bolen, and Crockett were restraining her while Beard, Eli Smith, and Crockett sexually assaulted her.[3] Plaintiff asserts that her ability to resist the assault—or to remember it in detail—was hampered by the lingering effects of the Klonopin pills. When she finally did escape their clutches as well as the party, Plaintiff succeeded in contacting her father for help; he in turn called 911 and requested emergency assistance. *Id.* at ¶¶ 35–38. Plaintiff was transported to the hospital in Frankfort.

**The Investigation and Aftermath**

The Frankfort Police Department dispatched Defendant Detective Robert Hession to the hospital to interview Plaintiff about the alleged assault. According to Plaintiff, he turned off the customary tape recording of the interview well before it was over, and began to behave in a confrontational, inappropriate manner while off the record. Hession allegedly told Plaintiff that the rape was her fault because she had dressed in a "provocative manner"; he further insinuated that she was "crying rape" because of race (some of her assailants were black, and Plaintiff is white). *Id.* at ¶¶ 39–43.[4] Hospital staff performed rape kit examinations on Plaintiff, and a nurse told her that she had suffered bruising and other injuries that usually occur only in instances of sexual assault. *Id.* at ¶¶ 46–47. After Plaintiff's release from the hospital, Defendant Hession requested a second interview with her. Plaintiff asked to have her hospital "Victim's Advocate" present at any new interview with Hession; Hession refused to accede to this request and did not perform a follow-up interview. *Id.* at ¶¶ 49–50.

---

[3] Plaintiff alleges that Beard, Eli Smith, and Crockett were holding down her wrists and ankles while they performed sexual acts on her; she also alleges that Bolen punched her in the mouth. We take this to be an allegation that all four of the defendants mentioned were complicit in the sexual assault, even if only Beard, Eli Smith, and Crockett actually performed sexual acts. *See* Compl. ¶¶ 31–34.

[4] With regard to the notion that she was dressed in a "provocative" manner—a consideration of course wholly irrelevant to whether a crime occurred—Plaintiff asserts that on the evening of the sexual assault she was dressed in jogging pants and a sweatshirt. Compl. ¶ 44.

Plaintiff and her family grew concerned about the slow progress of the Frankfort Police Department's investigation and expressed concerns to both the Mayor of Frankfort, Defendant Chris McBarnes, and the Frankfort Police Chief, Defendant Troy Bacon. More specifically, Plaintiff's father communicated to Bacon that both Hession and Defendant Jason Albaugh, a Frankfort Police Detective assigned to the matter, had personal contacts with the sexual assault suspects that had potentially compromised the integrity of their investigation. *Id.* at ¶¶ 59–60. According to Plaintiff, Albaugh's step-daughter, Defendant Autumn Dick, was in a long-term romantic relationship with Rodney "Boomer" Smith. Plaintiff also alleges that Hession had maintained inappropriate personal relationships with Beard, "Boomer" Smith, and Crockett. *Id.* at ¶ 60. Police Chief Bacon responded to these concerns by agreeing with Plaintiff's family that she should have no further contact with Hession; he demurred from promising any concrete action regarding the investigation, stating that "he knew nothing about the detective side of the case, because he has never been a detective before." *Id.* at ¶ 64. When told of Hession's behavior and the possible conflicts of interest among the officers, Mayor McBarnes promised Plaintiff's father that the officers would be "punished," agreeing that the case had been mishandled. *Id.* at ¶ 54.

Despite these assurances from the Mayor and the Police Chief, however, Plaintiff maintains that Defendants willfully impeded progress in the investigation of her assault and the prosecution of its perpetrators. Contrary to Mayor McBarnes's assurances, the rape kit from the hospital was not delivered to the Indiana State Police crime lab until five weeks after the examination—Plaintiff contends that this lapse greatly exceeds the standard practice in rape investigations. *Id.* at ¶ 56. The Frankfort Police never obtained a warrant to search the house at which the assault allegedly took place, nor did they ever collect any physical evidence from the

site. *Id.* at ¶ 57. A tape recording of Defendant Crockett, one of the alleged assailants, admitting that Plaintiff was incapacitated and thus unable to consent to sexual intercourse on the night of the assault, which recording Plaintiff's father forwarded to Hession, was never submitted as evidence to the prosecutor's office. *Id.* at ¶ 67. Neither Hession nor Albaugh was removed from his position heading the investigation, and, as of the filing of Plaintiff's Third Amended Complaint, the Frankfort Police had brought no charges against any of the alleged assailants. *Id.* at ¶ 68.

Plaintiff claims that the misconduct of Hession, Albaugh, Bacon, McBarnes, the Frankfort Police Department, and the City of Frankfort (collectively, the "Frankfort Defendants") caused her harm that extends beyond the frustration and outrage of witnessing a fruitless investigation that yielded no prosecution for her assault. She alleges that city and police officials verbally abused her, directing epithets at both her and her family. *See, e.g., id.* at ¶ 297. According to Plaintiff, the official mishandling of her case propagated a "blame the victim" attitude that caused her emotional and reputational harm, and led to incidents such as Defendant Caira Bolen's vandalism of her car. *Id.* at ¶ 304.[5] Because the assailants have not been punished, Plaintiff relates that she feels unsafe in the community; she avoided her high school graduation because several of the perpetrators would be present, and she changed her plans to attend Vincennes University because Defendant Eli Smith is a student there. *Id.* at ¶¶ 305–312.

## Procedural History

Plaintiff filed suit on April 8, 2013, against Rodney Smith, Jr., Rodney Smith, Sr., Eli Smith, Trey Crockett, Dakota Beard, Caira Bolen, Christina Bolen, the Frankfort Police Department, the City of Frankfort, Detective Jason Albaugh, Detective Robert Hession, and

---

[5] Bolen allegedly wrote "Seven guys in one night, What the F*** Whore." Compl. ¶ 304.

Frankfort Police Chief Troy Bacon.[6] Docket No. 1. The initial complaint consisted of ten claims, all of them rooted in state law. The Frankfort Defendants moved to dismiss this complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) on the grounds that it failed to raise a federal question. *See* Docket No. 16.

Plaintiff responded by filing an Amended Complaint on June 6, 2013. The Amended Complaint added three federal causes of action: deprivation of civil rights under 42 U.S.C. § 1983, conspiracy to violate civil rights under 42 U.S.C. § 1985(3), and failure to prevent conspiracy under 42 U.S.C. § 1986; it also contained fourteen state-law claims relating to both the sexual assault itself and the subsequent official response. Docket No. 21. Twelve days later, Plaintiff filed a Second Amended Complaint, adding Autumn Dick as a defendant and withdrawing seven of the state-law claims. Docket No. 33. The Frankfort Defendants moved to dismiss the Second Amended Complaint, Docket No. 54, and Defendants Caira and Christina Bolen filed their own motion to dismiss as well. Docket No. 46.[7]

On leave of the Court, Plaintiff refashioned her claims once again in the Third Amended Complaint, filed on August 8, 2013. Docket No. 63. The Third Amended Complaint varies little in its core allegations from earlier iterations; it does, however, remove Christina Bolen as a defendant and drops two additional state-law claims—those alleging negligence and intimidation. The Frankfort Defendants and Defendant Trey Crockett have filed separate motions to dismiss.

---

[6] The initial complaint also named "John Doe" as an unknown Defendant.
[7] The Bolen Motion to Dismiss remains before us; Caira Bolen has not filed a new motion to dismiss the Third Amended Complaint. Though the complaint against which the Bolen Motion to Dismiss was directed has been superseded by the Third Amended Complaint, the allegations against Caira Bolen in the two complaints are the same.

**Legal Analysis**

**Standard of Review**

The three motions before us seek dismissal on grounds of jurisdiction and the Plaintiff's failure to state a claim on which relief can be granted; they thus invoke Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), respectively. Although the standards of review mandated by these two provisions are similar, we now briefly summarize both.

**1. Rule 12(b)(1)**

The Federal Rules of Civil Procedure command that courts dismiss any suit over which they lack subject matter jurisdiction—whether acting on the motion of a party or *sua sponte. See* Fed. R. Civ. Pro. 12(b)(1). It is "fundamental that if a court is without jurisdiction of the subject matter it is without power to adjudicate and the case [must] be properly disposed of only by dismissal of the complaint for lack of jurisdiction." *Stewart v. United States,* 199 F.2d 517, 519 (7th Cir. 1952). In ruling on a motion to dismiss under Rule 12(b)(1), we "must accept the complaint's well-pleaded factual allegations as true and draw reasonable inferences from those allegations in the plaintiff's favor." *Franzoni v. Hartmax Corp.*, 300 F.3d 767, 771 (7th Cir. 2002); *Transit Express, Inc. v. Ettinger,* 246 F.3d 1018, 1023 (7th Cir. 2001). We may, however, "properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *See Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir. 1993); *Estate of Eiteljorg ex rel. Eiteljorg v. Eiteljorg,* 813 F. Supp. 2d 1069, 1074 (S.D. Ind. 2011).

**2. Rule 12(b)(6)**

Federal Rules of Civil Procedure 12(b)(6) authorizes dismissal of claims for "failure to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). In determining the

sufficiency of a claim, the court considers all allegations in the complaint to be true and draws such reasonable inferences as required in the plaintiff's favor. *Jacobs v. City of Chi.,* 215 F.3d 758, 765 (7th Cir. 2000). Federal Rules of Civil Procedure 8(a) applies, with several enumerated exceptions, to all civil claims, and it establishes a liberal pleading regime in which a plaintiff must provide only a "short and plain statement of the claim showing that [he] is entitled to relief," Fed. R. Civ. Pro. 8(a)(2); this reflects the modern policy judgment that claims should be "determined on their merits rather than through missteps in pleading." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 779 (7th Cir. 2007) (citing 2 James W. Moore, et al., *Moore's Federal Practice* § 8.04 (3d ed. 2006)). A pleading satisfies the core requirement of fairness to the defendant so long as it provides "enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1083 (7th Cir. 2008).

In its decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the United States Supreme Court introduced a more stringent formulation of the pleading requirements under Rule 8. In addition to providing fair notice to a defendant, the Court clarified that a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Plausibility requires more than labels and conclusions, and a "formulaic recitation of the elements of a cause of action will not do." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). Instead, the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Id.* The plausibility of a complaint depends upon the context in which the allegations are situated, and turns on more than the pleadings' level of factual

specificity; the same factually sparse pleading could be fantastic and unrealistic in one setting and entirely plausible in another. *See In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 370 (M.D. Pa. 2008).

Although *Twombly* and *Iqbal* represent a new gloss on the standards governing the sufficiency of pleadings, they do not overturn the fundamental principle of liberality embodied in Rule 8. As this Court has noted, "notice pleading is still all that is required, and 'a plaintiff still must provide only enough detail to give the defendant fair notice of what the claim is and the grounds upon which it rests, and, through his allegations, show that it is plausible, rather than merely speculative, that he is entitled to relief.'" *United States v. City of Evansville*, 2011 WL 52467, at *1 (S.D. Ind. Jan. 8, 2011) (quoting *Tamayo*, 526 F.3d at 1083). On a motion to dismiss, "the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994).

## Discussion

The Third Amended Complaint contains eight counts—four arising under federal law, and four arising under Indiana law. Count I states a cause of action under 42 U.S.C. 1983, alleging that the Frankfort Defendants and the sexual assault suspects[8] "acted in concert in their actions, (or the lack thereof) in their official capacities, and individual capacities, to deny Snyder [1] due process, [2] equal protection, and [3] the privileges and immunities of citizenship." Compl. ¶ 71. Count II, also pursuant to Section 1983, alleges an equal protection violation under a "class-of-one" theory against all defendants. Compl. ¶¶ 139–161. Counts III and IV respectively allege a conspiracy by all defendants to violate Plaintiff's civil rights pursuant to 42

---

[8] Plaintiff's references in the Complaint to the "suspects" or "perpetrators" denote Defendants Rodney Smith, Eli Smith, Trey Crockett, Dakota Beard, and Caira Bolden.

U.S.C. § 1985(3) and failure to prevent such a conspiracy by Mayor McBarnes, the City, and the Police Department pursuant to 42 U.S.C. § 1986. Compl. ¶¶ 162–288. The remaining counts—alleging intentional infliction of emotional distress, conspiracy, actual fraud, and constructive fraud—arise under Indiana law. *See* Compl. ¶¶ 289–388. We will address the federal claims and the state-law claims in turn.

## I.      Federal Claims

### A. Standing

At the outset, we observe that the possible scope of Plaintiff's federal causes of action is circumscribed by the limits of her standing to bring a constitutional claim. The "case or controversy" requirement of Article III imposes an "irreducible constitutional minimum" on a litigant's standing to bring suit in federal court, and the Supreme Court has distilled this into three threshold criteria. *See Allen v. Wright,* 468 U.S. 737, 751 (1984). First, the plaintiff must have suffered an "injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (citations omitted). Second, there must be a causal connection between the injury and the conduct complained of—the injury must be "fairly traceable to the challenged action of the defendant." *Id* (citing *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42 (1976)). Finally, it must be likely that the harm is redressable by a favorable decision. *Id.* at 561.

The Supreme Court's decision in *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973), encapsulates the principle that a person has no cognizable interest in the government's prosecution or non-prosecution of another. In *Linda R.S.*, the Court held that a woman had no standing to sue the state for its failure to prosecute the father of her children for failure to pay

child support. 410 U.S. at 617. In doing so, the Court reasoned that the plaintiff failed to demonstrate that government inaction in prosecuting another person caused her a concrete injury. *Id.* at 618–619. And even if the failure to enforce the child support criminal statute did injure her, the remedy available—the jailing of the deadbeat father—would not redress the harm she claimed to have sustained. *Id.*

Accordingly, Plaintiff has standing to challenge the Frankfort defendants' actions only to the extent that those actions were directed at *her* and harmed *her* interests. By itself, her interest in the "procedural" vindication of seeing her alleged assailants prosecuted—wholly natural and understandable though it may be—is no valid basis for a suit in federal court. *See, e.g., Golub v. Fed. Bureau of Investigation,* 2010 WL 3523009, at *3 (S.D. Ind. Aug. 31, 2010). Before reaching consideration on their substantive adequacy, all of her federal claims must clear this initial hurdle.

## B. Counts I and II -- Section 1983 Claims against Individual Defendants

All four of the federal counts assert that the individual defendants are responsible for deprivations of Plaintiff's constitutional rights. Because the legal questions controlling the viability of these claims apply equally to all of the individual defendants—even those that have not brought motions to dismiss—we consider these questions as they apply to the individual defendants *en masse,* distinguishing between defendants when the factual allegations so require.[9] Before turning to the theories of recovery raised by Plaintiff's Section 1983 claims, we note first that any claims brought under Section 1983 must allege action under "color of law." *See West v. Atkins,* 487 U.S. 42, 48 (1988). With exceptions not applicable here, this limitation excludes suits

---

[9] Count One does not explicitly name the individuals comprising the "Frankfort Defendants"—namely, Hession, Albaugh, Bacon, and McBarnes. However, these defendants feature prominently in the factual allegations set forth by Plaintiff pursuant to Count I (much more prominently than do the sexual assault suspects), *see, e.g.,*, Compl. ¶¶ 77, 84, & 85, and we therefore read Count I, like Counts II and III, as attempting to state a claim against all defendants.

against private individuals as defendants. *See Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999) (holding Section 1983 not implicated by "merely private conduct, no matter how discriminatory or wrongful"). Plaintiff's Section 1983 claims in Counts I and II against the "suspects" in the sexual assault and other private individuals—namely Rodney Smith, Eli Smith, Trey Crockett, Dakota Beard, Caira Bolen, and Autumn Dick—thus fail to state a claim and are subject to dismissal with prejudice. With respect to the Frankfort Defendants, who as municipal employees did act under color of state law, we now consider Plaintiff's theories in turn.

### 1. "Privileges or Immunities"

Plaintiff claims that the Frankfort Defendants' conduct deprived her of the "privileges or immunities" of citizenship in violation of the Fourteenth Amendment.[10] Shortly after the Fourteenth Amendment's ratification, the utility of the "privileges or immunities" clause for most types of litigation was dealt a near-fatal blow by the Supreme Court's decision in the *Slaughter-House Cases,* 21 L. Ed. 394 (1872). While the clause is not entirely moribund, the privileges or immunities of national citizenship to which it refers have been construed narrowly, extending to the right to petition Congress, to vote for national officers, to enter public lands, to be protected against violence while in the custody of a United States Marshall, and to inform federal authorities of the violation of federal law. *See Murphy v. Mount Carmel High Sch.,* 543 F.2d 1189, 1192 n.2 (7th Cir. 1976); *see also Saenz v. Roe,* 526 U.S. 489, 502 (1999) (holding that the privileges or immunities of national citizenship also protect newly-arrived state residents from discrimination based on their length of residency). Regardless of its exact contours, the

---

[10] The Complaint uses the term "privileges *and* immunities" rather than "privileges *or* immunities." The Constitution uses the former phrasing in Article IV, Section 2, whereas the "privileges *or* immunities" clause is found in Section I of the Fourteenth Amendment. The provision in Article IV has been held to prohibit states' discrimination against out-of-state citizens, and is clearly inapplicable here, where all concerned are Indiana residents. *See McBurney v. Young,* 133 S. Ct. 1709, 1714 (2013). The Frankfort Defendants' motion to dismiss discusses only Article IV privileges and immunities, *see* Frankfort Defs.' Br. 6; Plaintiff responds that the Complaint referred instead to Fourteenth Amendment privileges or immunities. *See* Pl.'s Resp. 4. We construe it as attempting to raise a Fourteenth Amendment claim despite this error.

privileges or immunities clause does not extend to any facet of the conduct of a local government towards a citizen with respect to the investigation of an alleged crime.[11]

## 2. Due Process

Plaintiff states a claim for a violation of "due process" without further substantiating the nature of her legal theory. Under either the "procedural" or "substantive" branches of due process doctrine, however, her claim falls short as a matter of law.

In order to recover on a due process claim, a plaintiff must establish that she was deprived of a constitutionally-guaranteed right—or, put in other terms, that the government violated its constitutional duty to her. In a procedural due process claim, this must be an interest in life, liberty, or property, *Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989); in a substantive due process claim, it must be one of the "fundamental rights"—a category that has been strictly limited by the Supreme Court in recent years, but which has been held to include interests in "marriage, family, procreation, and the right to bodily integrity." *See Albright v. Oliver,* 510 U.S. 266, 272 (1994) (plurality opinion); *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 842 (1998) (discussing narrow construction of rights giving rise to due process claims).

In *DeShaney v. Winnebago County Department of Social Services,* 489 U.S. 189 (1989), the Supreme Court held that "nothing in the language of the Due Process Clause . . . requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." 489 U.S. at 195. Unless the state has "affirmatively placed a particular individual in a position of danger" or exercises some degree of custody over him, it has no duty to "protect [an] individual[]

---

[11] Plaintiff has submitted documents in support of its privileges or immunities theory, including a policy statement related to the Violence Against Women Act (VAWA) grant program and a U.S. Department of Justice "National Protocol for Sexual Assault Medical Forensic Examinations." *See* Docket No. 75. Even if these documents were somehow legally binding on the City of Frankfort, *see* Frankfort Defs.' Reply 6 (explaining their non-binding character), they are irrelevant to any possible privileges or immunities claim. Accordingly, we need not consider the Frankfort Defendants' argument that the documents must be stricken. *See* Frankfort Defs.' Reply 6.

from harm" at the hands of third parties. *See Buchanan-Moore v. Cnty. of Milwaukee,* 570 F.3d 824, 827–828 (7th Cir. 2009). Extending the reasoning of *DeShaney,* several courts have held that just as there is no duty to protect from private violence, so is there no duty to investigate a particular crime or prevent future crimes. *See Oliver v. Collins,* 914 F.2d 56, 60 (5th Cir. 1990); *Bonds v. S. Bend Police Dep't,* 2010 WL 2653470, at *2 (N.D. Ind. June 24, 2010). Recently, the Seventh Circuit, sitting *en banc* in *Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012), endorsed this view. Addressing a plaintiff's constitutional claim based on the local police department's failure to respond to his complaints of gang harassment, the judges took three different views on whether the plaintiff had adequately pleaded an equal protection claim. *See infra* § I(B)(3). All ten, however, at least tacitly agreed that the due process clause is not implicated by the failure of a police department or its officers to investigate a crime or protect the alleged victim from suffering further harm at the hands of third parties. *See* 680 F.3d at 899–900 (Posner, J., concurring in disposition); 680 F.3d at 901 (Easterbrook, J., concurring); 680 F.3d at 909 (Wood, J., dissenting).[12]

Here, Plaintiff has not alleged that she suffered deprivation of a cognizable interest in life, liberty, or property at the hands of the Frankfort Defendants—or that the Frankfort Defendants' egregious conduct deprived her of a fundamental right. In connection with another count in the Complaint, she does allege that the Frankfort Defendants' conduct caused her emotional turmoil and left her feeling unsafe in the community. Compl. ¶¶ 307–310. She also

---

[12] We elect not to discuss Plaintiff's counterarguments on this score at any length because they stray so far from the bounds of persuasive legal discourse. In attempting to refute the Frankfort Defendants' assertion, grounded in *DeShaney,* that local governments have no constitutional duty to protect citizens from harm at the hands of third parties, Plaintiff makes two argumentative thrusts, both equally misdirected. First, she cites a string of Indiana tort cases discussing the duty of care imposed on defendants in common-law negligence actions. Second, she contends that the Court should simply ignore Supreme Court precedent, namely *DeShaney*: "The Fourteenth Amendment (and specifically the Due Process Clause of the Fourteenth Amendment) should be understood and interpreted as to have created a general constitutional right to protection as it was intended instead of the novel and oft-challenged opinion in *DeShaney* . . . ." Pl.'s Resp. 10. Of course, the first of Plaintiff's points is immaterial, and the second displays a failure to understand the fundamental constraints imposed on federal courts applying federal law.

asserts that the presence of Eli Smith, one of the sexual assailants, as a student at Vincennes University prompted her to change her plans to enroll there. *Id.* at ¶ 312. While a "campaign of defamation, harassment, and intimidation" by state actors may trigger due process protections if it causes significant disruptions in a plaintiff's personal or financial interests, *see Thomas v. Independence Twp.*, 463 F.3d 285, 197 (3d Cir. 2006), Plaintiff has not alleged that the Frankfort Defendants' direct actions had such an impact on her; even if Detective Hession's behavior towards her could be dubbed verbal harassment, nowhere does Plaintiff draw a connection between any police action and the loss of any protected interest. Rather, the insecurity she claims to suffer stems from the consequences of *inaction*: in her words, she "fears insecurity because these PERPETRATORS and DEFENDANTS are permitted to roam free." Compl. ¶ 307. Even where the misconduct of third parties causes disruptions more drastic than those at issue her—as in *Del Marcelle*, where the plaintiffs resorted to selling their house and fleeing their town—no due process claim arises. *Cf. Del Marcelle,* 680 F.3d at 888. Plaintiff has failed to state a claim against any of the individual Frankfort Defendants under the due process clause.

### 3. Equal Protection

The third and last of Plaintiff's constitutional theories under Section 1983 is the most viable. While the "privileges or immunities" and due process clauses protect certain irreducible minimum entitlements from arbitrary or outrageous government action, the equal protection clause—despite its original focus on racial discrimination—may also serve as a bulwark against discrimination and unfairness in a more global sense. *See generally Vill. of Willowbrook v. Olech,* 528 U.S. 562 (2000); *see also F. S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415 (1920) (a fundamental purpose of the equal protection clause is to ensure that "all persons similarly circumstanced shall be treated alike"). Indeed, the principles of standing reflect this

distinction; in some cases, the denial of equal treatment itself is sufficient to fulfill the criterion of injury in fact. *See Heckler v. Mathews,* 465 U.S. 728, 739–740 (1984) (holding that "discrimination itself… can cause serious non-economic injuries"). While she has proven unable to establish that state actors deprived her of any constitutionally guaranteed rights, she may yet be able to show that the *manner* in which she was treated itself constituted a failure of equal protection.

As the Frankfort Defendants have noted, Plaintiff seems to pursue two distinct equal protection threads: that she suffered gender discrimination and that she was the victim of unfair treatment as a "class of one."

### a. Gender Discrimination

To state a claim for an equal protection violation based on her gender, a plaintiff must show that (1) the defendants discriminated against her based on her membership in a definable class, and (2) the defendants acted with a "nefarious discriminatory purpose." *See Nabozny v. Podlesny,* 92 F.3d 446, 453 (7th Cir. 1996). "Discriminatory purpose . . . implies more than intent as volition or intent as awareness of consequences. It implies that a decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effects on the identifiable group." *Shango v. Jurich,* 681 F.2d 1091, 1104 (7th Cir. 1982). The intentional, selective withdrawal of police protection from a disfavored class is the "prototypical denial of equal protection." *See McCauley v. City of Chi.*, 671 F.3d 611, 618 (7th Cir. 2011); *see also DeShaney,* 489 U.S. at 197 n.3 ("The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause.").

Here, as the Frankfort Defendants note in their motion to dismiss, Plaintiff has not alleged that police officers failed to investigate her rape allegations because she was a woman. In her Complaint, Plaintiff asserts that she "was entitled to police protection due to her being included in a protected class, as she is female, but the [Frankfort Defendants] decided to withdraw all protection out of sheer malice . . . ." Compl. ¶ 125. However, she does not devote any of her briefing to argument on the theory of gender discrimination. While she continues to allege that the Frankfort Police have a "policy for conducting rape cases that is an unconstitutional practice . . . and denies individuals equal protection of the laws," and that they "ha[ve] adopted a policy of blaming victims for their own rapes," these are merely conclusory recitations. *See infra,* § I(C). Plaintiff has fallen far short in her efforts to state an adequate equal protection claim for gender discrimination; alternatively, she focuses most of her attention on her "class of one" theory, to which we now turn.

### b. "Class of One"

#### i. Legal Standard

Plaintiff contends that the Frankfort Defendants acted "intentionally in their individual and official capacities to deny [Plaintiff] . . . equal protection, and . . . all acts and omissions were done for reasons of a personal nature and were unrelated to the duties of the Defendant's [sic] positions." Compl. ¶ 140. The Supreme Court has recognized that a plaintiff may bring an equal protection claim alleging that she has suffered discrimination as a "class of one"—that is, regardless of her membership in any recognized protected class. In *Village of Willowbrook v. Olech,* 528 U.S. 562 (2000), the Supreme Court set forth the general standard governing such claims: the plaintiff must allege that "she has been intentionally treated differently from others

similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. at 564.

Where a Plaintiff presses a "class of one" claim against law enforcement officers, however, a heightened showing of improper motive is necessary. In areas like law enforcement and government employment—in contrast to legislative acts of general applicability—some degree of discretion and "arbitrary" decision-making is unavoidable. *See Hanes v. Zurick*, 578 F.3d 491, 495 (7th Cir. 2009) (discussing the different degrees of discretion afforded to government employment decisions and law enforcement actions). A traffic officer, for instance, necessarily acts arbitrarily in selecting whose car to stop among the vast number of drivers exceeding the speed limit on a given highway. *See Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603–604 (2008). Similarly, law enforcement officers are faced with resource and time constraints that often make the allocation of equal resources to all investigations impractical; some discretion is necessary, and the equal protection clause does not require that each such decision be accompanied by a persuasive rationale. However, police officers' discretion "does not extend to discriminating against or harassing people"; a plaintiff may therefore have a valid equal protection claim where she can show that the differential treatment she received was not only arbitrary, but invidious. *See Geinosky v. City of Chi.*, 675 F.3d 743, 747 (7th Cir. 2012).

The Seventh Circuit, sitting *en banc* in *Del Marcelle*, was unable to articulate a precise standard for "class of one" cases of this type that could command a majority of the court. Four judges joined Judge Posner in proposing that "the plaintiff be required to show that he was the victim of discrimination intentionally visited on him by state actors who knew or should have known that they had no justification, based on their public duties, for singling him out for unfavorable treatment—*who acted in other words for personal reasons, with discriminatory*

*intent and effect*." 680 F.3d at 889 (emphasis original). Five judges joined Judge Wood, who countered with a broader standard in which *irrationality* is the touchstone, and improper *personal* motives are merely a sufficient, not necessary, means of demonstrating such irrationality. "[T]he plaintiff has the burden of showing in the complaint some plausible reason to think that intentional and irrational discrimination has occurred. Pleading animus or improper purpose will often be an effective way to accomplish that goal." *Id.* at 917.

Because these contrasting views do not provide authoritative guidance, we find it necessary to turn back to the Seventh Circuit's earlier statements on the question, which track more closely with Judge Posner's preferred view in requiring an improper personal purpose in order to state a "class of one" claim. In *Hilton v. City of Wheeling,* 209 F.3d 1005 (7th Cir. 2000), the court held that "to make out a prima facie case the plaintiff must present evidence that the defendant deliberately sought to deprive him of the equal protection of the laws for reasons of a personal nature unrelated to the duties of the defendant's position." 209 F.3d at 1008. In such "vindictive action" cases, the plaintiff needs to show that he suffered unfair treatment as a result a "totally illegitimate animus." *Id.*

### ii. Application of the Standard to Detectives' Conduct

Here, Plaintiff has met her initial burden of pleading facts plausibly giving rise to an inference that she suffered (1) discriminatory treatment that (2) sprung from an improper non-professional motive.

In "class of one" claims challenging the government's execution of discretionary functions, plaintiffs must ordinarily point to evidence that individuals similarly situated to themselves received different treatment; in most cases, this is necessary to "distinguish between unfortunate mistakes and actionable, deliberate discrimination." *See Geinosky,* 675 F.3d at 747–

748. As the court in *Geinosky* explained, however, there are circumstances where comparators are unnecessary—instances of official misconduct whose deviation from the benign application of discretion is readily apparent standing alone. *Id.* at 748. In that case, the court found that where a plaintiff had received 24 dubious parking tickets over a two-year period, requiring him to point to other citizens with similar driving habits who hadn't been so treated would be both unrealistic and unhelpful. *Id.* Similarly, while Plaintiff here could likely point to other sexual assault victims in Frankfort who were not treated with scorn and whose investigations were not deliberately undermined, such a comparison would hardly be illuminating as to the more egregious aspects of this case. While evidence of the bounds of acceptable conduct with regard to some aspects of the investigation—such as whether the delay in processing the rape kit was anomalously long—might be useful, it requires no side-by-side comparison to surmise that Hession's alleged treatment of Plaintiff exceeds those bounds.[13]

　　　Plaintiff has also successfully alleged the officers' improper intent. On her account, the source of the personal animosity against her in the Frankfort Police Department is the personal contacts that Albaugh and Hession have with some of the alleged sexual assault perpetrators. Because Detective Albaugh's daughter, Defendant Autumn Dick, is allegedly in a long-term romantic relationship with perpetrator "Boomer" Smith and has a child with him, Plaintiff contends that Albaugh was motivated to ensure that Smith never got prosecuted, prompting his efforts aimed at obstructing the investigation or discrediting the alleged victim. Compl. ¶ 60. Detective Hession, she argues, possesses a similar personal motive: he is personally acquainted with alleged assailant Trey Crockett and with the father of alleged assailant Dakota Beard. *Id.* at ¶ 165. Hession and Albaugh, she alleges, held primary responsibility for investigating her rape

---

[13] Plaintiff will likely require a more complete and persuasive evidentiary showing, of course, to prevail on the merits or survive summary judgment. Here, however, we deal only with the adequacy of her Complaint.

complaint, and they did so in a notably substandard manner.[14] In his initial interview with her, Hession allegedly accused her of "crying rape" because one of her accused assailants was black; he further insinuated that she "asked" to be raped having dressed in a provocative manner. *Id.* at 42–43. Plaintiff's father provided the police a taped statement taken from one of the perpetrators admitting that Plaintiff was in no position to consent to sexual activity on the night of the assault; this evidence was never forwarded to the prosecutor's office. *Id.* at ¶ 51. Similarly, medical records from Plaintiff's physical examination at the hospital were never forwarded. Neither Hession and Albaugh nor any other Frankfort officers conducted an investigation at the house where the crime allegedly occurred or gathered any physical evidence. *Id.* at ¶ 57. The rape kit examination performed at the hospital on Plaintiff immediately after the incident was not sent to a state lab for processing for five weeks. *Id.* at 56. Plaintiff alleges further that figures with authority over Hession and Albaugh—namely Chief Bacon and Mayor McBarnes—knew of the detectives' inappropriate conflicts of interest but did nothing to ensure the integrity of the investigation. When informed of the officers' personal ties, McBarnes promised to "take care of the situation" and "punish the police officers"; instead, Plaintiff insists, he took no action. Pl.'s Resp. 2 (citing Compl. ¶¶ 254, 258). Plaintiff also alleges that her father and mother communicated their concerns about the investigation to Police Chief Bacon, who similarly did nothing; he told the Snyder family that he would have to "get back to them" because he "knew nothing about the detective side of the case and he ha[d] never been a detective before." Compl. ¶ 64.

Plaintiff contends that these facts are sufficient to give rise to an inference that Hession, Albaugh, Bacon, and McBarnes intentionally failed to conduct an adequate investigation of

---

[14] Plaintiff also asserts that Hession, who was inexperienced as a detective and had handled only one rape investigation previously, should not have been tasked with leading an investigation in the first place. Compl. ¶¶ 105–106.

Plaintiff's sexual assault because of the detectives' personal interest in the non-prosecution of the perpetrators. Police officers' failure to take a crime victim seriously stemming simply from their disbelief in her accusations—even an officer's insinuation that she is lying or "crying rape"—may not necessarily satisfy the Seventh Circuit's requirement that there be discrimination *and* improper motive. *Cf. Del Marcelle,* 680 F.3d at 899 (plurality opinion holding that no equal protection violation exists where "[t]he police ignore the plaintiff's complaints . . . on the ground that he was off his rocker"). But stifling an investigation because of extramural personal entanglements with the suspects is the very archetype of a "lack of justification based on public duties for singling out the plaintiff." Plaintiff adequately alleges that she was singled out for unfair treatment because of the personal ties of those she accused. *See id.,* 680 F.3d at 913 (Wood, J., dissenting) (noting that the existence of such a motive would suffice under either her standard or that of the plurality); *see also Geinosky,* 675 F.3d at 748.

### iii. Liability of Bacon and McBarnes

The contours of Plaintiff's equal protection claim against Hession and Albaugh are similarly straightforward: if indeed there was a constitutional violation, it is clear that the two detectives committed it. However, determining the existence of a claim against Bacon and McBarnes—whom Plaintiff does not allege had the same improper ties to the perpetrators—requires additional discussion. *Respondeat superior* is, of course, unavailable as a basis for imposing liability on the supervisors of state actors who have violated the Constitution under Section 1983. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 n.58 (1978). Here, however, Plaintiff alleges that both Bacon and McBarnes were fully aware of the two detectives' improper personal entanglements with the investigation, yet either did nothing to address the issue or were affirmatively complicit in sabotaging the investigation. In *Jones v. City of Chicago,* 856 F.2d 985

(7th Cir. 1988), the Seventh Circuit formulated a standard for imposing supervisors' liability in Section 1983 cases. "The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference." 856 F.2d at 992–993. Additionally, the usual showing of causation must be made; the plaintiff must show that the supervisor's action or inaction was "affirmatively linked" to the deprivation of the plaintiff's federal rights. *See Rizzo v. Goode,* 423 U.S. 362, 371 (1976).

With respect to the knowledge requirement, Plaintiff alleges that both Bacon and McBarnes had actual knowledge of the detectives' wrongdoing, and further that both men promised to take remedial action and then ultimately did nothing. A fact-finder could plausibly infer from these factual accusations that Bacon and McBarnes were either complicit in the officers' improper conduct themselves, or at least "turned a blind eye" to the conflict of interest to avoid inconvenience. *Cf. Jones,* 856 F.2d at 993 (jury could reasonably impose liability where supervisory defendants "had known every false step taken by the subordinate officers, had approved every false step," and were complicit in the mishandling and destruction of evidence). The causation requirement, however, is satisfied only with respect to Chief Bacon. As the head of the Police Department, Bacon is vested with policymaking authority over his department—an authority that presumptively includes the oversight of his officers' investigative practices. *See Eversole v. Steele,* 59 F.3d 710, 715 (7th Cir. 1995). In contrast, as the mayor of a third-class Indiana city, McBarnes lacks statutory authority over either police policy or the department's personnel matters. *See Warner v. City of Terre Haute, Ind.*, 30 F. Supp. 2d 1107, 1124 (S.D. Ind. 1998); *see also supra,* § I(C) (discussing this issue in relation to Plaintiff's claim that the Mayor

possesses "final decision-making authority"). We thus cannot say that McBarnes's action or inaction was a proximate cause of any constitutional violation that occurred.

### iv. Frankfort Defendants' Arguments

We do not find persuasive the Frankfort Defendants' arguments against the viability of this "class of one" equal protection claim. First, they contend that a claim of the type brought by Plaintiff fails as a matter of law because the allegations do not show that the unequal treatment was targeted directly at her. "The rape investigation, regardless of the officers' alleged motives, was directed at the suspects, not Snyder. Even the alleged motive—a desire to protect the suspects because the officers knew them personally—is wholly unconnected to Snyder. Presuming the allegations in the complaint are true, the officers would 'protect' the alleged suspects regardless of who the victim was…." Frankfort Defs.' Reply 8. Second, citing Judge Wood's dissenting opinion in *Del Marcelle,* the Frankfort Defendants argue that the "failure to investigate, arrest, or prosecute the perpetrators" is not a direct injury to a crime victim, and thus such conduct does not constitute a deprivation of equal protection as a matter of law. Frankfort Defs.' Br. 13–14 (quoting *Del Marcelle,* 680 F.3d at 910).

The Frankfort Defendants' argument takes too literally the term "class of one," and it misconstrues the language of the *Del Marcelle* decision. Despite the name, a "class of one" can contain any number of individuals; its distinguishing feature is that its constituents suffer unequal treatment for a reason not related to their membership in an identifiable, protected class. *See Olech,* 528 U.S. at 563 n.1 ("Whether the complaint alleges a class of one or of five is of no consequence because we conclude that the number of individuals in a class is immaterial for equal protection analysis."). That the officers' alleged misconduct was prompted not by any unique characteristics she possessed, but rather by the happenstance that the officers had interest

in protecting the accused, is not fatal to the claim. Plaintiff's *ad hoc* "class" could be victims of sexual assault at the hands of persons personally connected to the Frankfort Police Department; whether such a group consists of only her or others is irrelevant to the issue of whether she suffered intentional and arbitrary discrimination. *See id.* at 564.

More important, the Frankfort Defendants' assertion that *Del Marcelle* bars "failure to prosecute" equal protection claims misses the mark. The Supreme Court's seminal language in *Olech* speaks broadly with regard to the harm suffered in a class of one equal protection case: the plaintiff must allege that she "has been treated differently from others similarly situated." 528 U.S. at 564. Read properly, the passage Defendants have quoted from Judge Wood's opinion in *Del Marcelle* is fully consistent with this broad view—and with the basic principle that equal protection focuses not on the loss of a particular entitlement or the suffering of a threshold level of harm, but the presence of unfair *treatment*:

> "[E]xamples of sound equal protection claims that exist even where there would be no underlying due process right come readily to mind . . . . Importantly, the equal protection claim that Del Marcelle is trying to raise is different from a claim that takes issue with an arrest or a citation. If all that Del Marcelle were arguing was that police should not have cited him because he had done nothing wrong (and in fact, it was the bikers who were the real offenders), that would be akin to challenging the citations themselves, or perhaps it would provide support for a state-law claim of selective prosecution. The citations themselves, however, are not necessary to Del Marcelle's equal protection claim. The point is that the police are treating *him* differently, in a way that injures him. Whether that differential treatment takes the form of baseless citations, or malicious arrests, or any other adverse action, makes no difference.

680 F.3d at 910.[15] Contrary to the Frankfort Defendants' assertions, only Judge Easterbrook among the ten panelists in *Del Marcelle* would have held that police failure to investigate crimes

---

[15] The real object of contention in *Del Marcelle* is the same question that has made "class of one" suits controversial in the context of law enforcement: whether it is possible to formulate a workable standard that separates truly unconstitutional conduct from the inherently discretionary nature of enforcement work without unacceptably handicapping police work and constitutionalizing every instance of differential treatment. It is this thorny debate,

or protect from future crimes cannot support an equal protection claim. 680 F.3d at 901 (Easterbrook, J.) ("His contention is that the police failed to protect him, personally, from private aggression that targeted him, personally. *DeShaney* shows that this is not a good constitutional claim."). Indeed, courts both within and without the Seventh Circuit have accepted equal protection claims on grounds of the failure or withdrawal of police protection. *See Angsten v. Blameuser,* 2005 WL 3095513, at *2 (N.D. Ill. Nov. 16, 2005) (denying a motion to dismiss a claim that defendant police chief intentionally failed to investigate or halt third parties' crimes against the plaintiff because he "did not like" the plaintiff); *see also Shipp v. McMahon,* 234 F.3d 907 (5th Cir. 2000), overruled on other grounds by *McClendon v. City of Columbia,* 305 F.3d 314 (5th Cir. 2002) (granting leave to amend complaint to include a class of one claim where a police officer allegedly failed to take action on domestic abuse claims because he knew the abuser); *Shaud v. Sugarloaf Twp. Supervisors*, 2008 WL 313849, at *5 (M.D. Pa. Feb. 4, 2008). Plaintiff here alleges that the Frankfort Defendants' conduct denied her not only the intangible sense of justice and closure that may come with seeing one's attackers subjected to the punishment merited by law, but also a sense of well-being and security in her own community, driving her to avoid at all costs contact with the perpetrators. Unlike the allegations of gender-based discrimination, her allegations are plausibly grounded in assertions of fact rather than formulaic recitations of the elements of a cause of action. *Cf.* Compl. ¶ 93 ("the Frankfort Police Department has adopted a policy of blaming victims for their own rapes"); *Iqbal*, 556 U.S. at 678. This is enough to state a claim under the equal protection clause.

---

which we have already addressed above, that the Frankfort Defendants seem to conflate with the issues of standing and harm in an equal protection case.

### v. Summary of the Class of One Claim

We have thus concluded that Plaintiff has stated an equal protection claim against Defendants Hession, Albaugh, and Bacon on a "class of one" theory—against Hession and Albaugh for their direct participation in unconstitutional conduct, and against Bacon for supervisory liability as their employer. Because we have found this claim—but none of the others under Section 1983—viable on its face, we now address whether the officers are entitled to qualified immunity notwithstanding the factual allegations in the Complaint.

### 3. Qualified Immunity

The Frankfort Defendants argue that, even if Plaintiff has properly pleaded the elements of a claim against the defendant individuals, qualified immunity nonetheless shields them from liability and warrants dismissal.[16] When they are accused of violating a plaintiff's constitutional rights, state actors are entitled to qualified immunity for their actions unless they violated constitutional or statutory rights that were "clearly established" at the time of their conduct. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties *reasonably*." *Id.* (emphasis added).

We must then ask whether, as of April 2012, a reasonable police officer (or a reasonable police chief or mayor, in the cases of Bacon and McBarnes, respectively) would have known that the conduct they engaged in deprived Plaintiff of the equal protection of the laws in violation of

---

[16] They assert this defense to all of the constitutional theories brought under Section 1983, but we discuss it only with respect to the equal protection "class of one" claim, since it is the only claim for which independent grounds for dismissal do not exist.

the Constitution. Here, binding Seventh Circuit precedent at the time established that "withholding all police protection" from a plaintiff, at least when prompted by invidious personal motives, violates the Constitution. In *Hanes v. Zurick,* 578 F.3d 491 (7th Cir. 2009), the Seventh Circuit stated as much, holding that the right to be free from such police conduct had been "clearly established" at least since the court's previous decision in *Hilton v. City of Wheeling,* 209 F.3d 1005 (7th Cir. 2000). 578 F.3d at 496. Both *Hanes* and *Hilton* involved somewhat different facts from those here—in both cases, the police cited or arrested the plaintiff as well as failing to take appropriate action against the third party against whom the plaintiff was aggrieved. The crux of the plaintiffs' claims in each case, however, was that the police had failed to act even-handedly—they had *withdrawn their protection* for inappropriate reasons. And it was in these terms that the court delineated the constitutional right in question. The court in *Hilton* held: "If the police decided to withdraw all protection from Hilton out of sheer malice, or because they had been bribed by his neighbors, [plaintiff] would state a claim." 209 F.3d at 1007. The *Hanes* court distilled this holding still further as protecting the "right to police protection uncorrupted by personal animus." 578 F.3d at 496.[17]

The Supreme Court has stated that for a right to be "clearly established" for purposes of qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an

---

[17] The Frankfort Defendants argue, correctly, that Seventh Circuit doctrine on the issue of "class of one" claims remains in flux. However, the unsettled question in the court's jurisprudence centers on the showing of *intent* required. *See generally Del Marcelle,* 680 F.3d at 889; *see also Hanes,* 578 F.3d at 497 (noting that "there has been some indecision in this circuit over whether there is an animus requirement") (citing *United States v. Moore,* 543 F.3d 891, 898 (7th Cir. 2008). The extent to which a showing of personal animus, rather than mere lack of rational basis, is required to state an equal protection claim, however, is irrelevant to the qualified immunity analysis here; Plaintiff has alleged that the Frankfort Defendants had an improper personal motive that satisfies either of the competing formulations of the constitutional violation.

official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987). We conclude that, in light of the Seventh Circuit's previous statements, it would be apparent to a reasonable officer or municipal authority figure that undermining a rape investigation based on officers' personal ties to the suspects is unlawful. Indeed, a reasonable officer would hardly need analogous Seventh Circuit precedent to tell him that. It strains credulity that any police officer, even if he failed entirely to keep in touch with the pronouncements of higher courts, would ever believe in good faith that such conduct was consistent with his duty to enforce the law evenhandedly.

If the allegations in Plaintiff's complaint are proven, the Frankfort Defendants' conduct would not be shielded by qualified immunity. The allegations need not be proven at the pleading stage, even if the Plaintiff will ultimately bear the burden of proving that qualified immunity does not apply once the defense has been asserted. *See Crawford-El v. Britton,* 523 U.S. 574, 587 (1998). "Because an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate: '[T]he plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity.'" *Alvarado v. Litscher,* 267 F.3d 648, 651–652 (7th Cir. 2001) (quoting *Jacobs,* 215 F.3d at 765 n.3). Even if later factual development complicates or erases entirely the picture painted by the Complaint, it is our task at this stage to take Plaintiff's well-pleaded allegations as true—for purposes of evaluating her claim as well as the affirmative defenses asserted against it.

Although Plaintiff's other constitutional claims under Section 1983 fail, we conclude that she has adequately stated an equal protection "class of one" claim against the individual

Frankfort Defendants—Detectives Hession and Albaugh, Chief Bacon, and Mayor McBarnes. We further conclude that qualified immunity does not warrant dismissal at this stage.

## C. Count I – Section 1983 Claims Against Municipal Defendants

Plaintiff's complaint additionally charges two municipal entities, the City of Frankfort and the Frankfort Police Department, with liability under Section 1983.

Before addressing the substance of the municipal liability claim, we note that the Frankfort Police Department is not a proper defendant in a Section 1983 action. The Supreme Court in *Monell v. Department of Social Services,* 436 U.S. 658 (1978), held that municipalities may be sued as "persons" acting under color of state law under Section 1983. 436 U.S. at 690. The Court has since held that state law determines what entities are subject to municipal liability within this framework. *McMillan v. Monroe Cnty.*, 520 U.S. 781, 786 (1997). Under Indiana law, a city's police department is not a municipal entity capable of suing or being sued. *See McAllister v. Town of Burns Harbor,* 693 F. Supp. 2d 815, 822 n.2 (N.D. Ind. 2010) (citing *Slay v. Marion Cnty. Sheriff's Dep't*, 603 N.E.2d 877, 887 (Ind. Ct. App. 1992)). "Because a city's police department is 'merely a vehicle through which the city government fulfills its policy functions,' it is not a proper defendant in a civil rights suit under Section 1983." *Branson v. Newburgh Police Dep't*, 849 F. Supp.2d 802, 808 (S.D. Ind. 2011); *see also Martin v. Fort Wayne Police Dep't*, 2010 WL 4876728, at *6 (N.D. Ind. Nov. 23, 2010). The Section 1983 claims against the Frankfort Police Department as an entity must therefore be dismissed.

That leaves the entity liability claims against the City of Frankfort. In her allegations in support of Count I, Plaintiff asserts that the City "decided to withdraw all protection out of sheer malice and conspiracies with the suspects . . . ." Compl. ¶ 125. Elsewhere, she charges that the

City has "adopted a policy of knowing about police misconduct and assuring its citizens that the wrong will be corrected with no intention to correct the situation, or at the very least, not acting properly on their representations," *id.* at ¶ 134, and that the city has "adopted a policy of knowing about police misconduct and refusing to do anything about it." *Id.* at ¶ 135.[18]

Under *Monell,* "a constitutional deprivation may be attributable to a municipality when execution of a government's policy or custom ... inflicts the injury." *Houskins v. Sheehan,* 549 F.3d 480, 493 (7th Cir. 2008) (quoting *Montano v. City of Chi.,* 535 F.3d 558, 570 (7th Cir. 2008)) (further citations omitted). There are three means by which a plaintiff can show that a constitutional deprivation resulted from the execution of a municipal policy or custom: she can point to "(1) an express policy causing the loss when enforced; (2) a widespread practice constituting a 'custom or usage' causing the loss; or (3) a person with final policymaking authority causing the loss." *Walker v. Sheehan,* 526 F.3d 973, 977 (7th Cir. 2008). Here, the complaint alleges that the city had express or *de facto* unconstitutional policies, and also that Mayor McBarnes, as a figure with final decision-making authority, set municipal policy by his actions. Because we have concluded that the complaint states a claim for underlying constitutional deprivation only with respect to the equal protection "class of one" claim, we need consider municipal liability only on that theory and not the others. *See Collins v. City of Harker Heights,* 503 U.S. 115, 120 (1992) (holding that *Monell* standard requires a two-part inquiry: whether a deprivation occurred, and whether it was pursuant to municipal policy or custom).

Plaintiff's claims that the city had express policies or long-established customs of unconstitutional denial of equal protection fail to satisfy the pleading requirements of *Twombly* and *Iqbal.* The first and most specific of Plaintiff's "policy" allegations is simply a restatement

of what Mayor McBarnes said to the Snyder family on one occasion. As we have already discussed, Plaintiff alleges that, when apprised of the detectives' improper conflict of interest, the Mayor "expressed concern over the way that his case was handled and assured Snyder's father that the police officers 'would be punished.'" Compl. ¶ 54; *see also* Compl. ¶¶ 254, 258. It appears that, based on this one incident and no others, Plaintiff formulated her assertion that the City of Frankfort has a *policy* of falsely reassuring citizens that corrective action will be undertaken when confronted with news of police misconduct. *See* Compl. ¶ 134. Such a repackaging of a single factual allegation into a broad legal claim is precisely the sort of "mere conclusory statement[]" that *Iqbal* held to be insufficient to state a claim. *See Iqbal,* 556 U.S. at 678. Plaintiff's follow-up allegation that the city has a "policy of knowing about police misconduct and refusing to do anything about it" suffers from the same deficiency. *See* Compl. ¶ 135.

The only time, in fact, that a single action suffices to establish a municipal policy is when the action is taken by a person with "final decision-making authority." *Walker,* 526 F.3d at 977. In her response to this motion, Plaintiff argues that because Mayor McBarnes is such a figure, evidence of his conduct satisfies *Monell.* As discussed previously, however, Mayor McBarnes is not vested by Indiana law with such authority over the affairs of the city police department. Indiana law controls this question, and it provides that the chief of police, not mayor, is the final decision-making authority with respect to law enforcement policy. *See Eversole,* 59 F.3d at 715. In the state's second- and third-class cities such as Frankfort, control over personnel matters in police and fire departments, by contrast, is vested in the city's Safety Board; specifically, the Safety Board has authority to "adopt rules for the government and discipline of the police and fire departments" and to "adopt general and special orders to the police and fire departments

through the chiefs of the departments." Ind. Code § 36-8-3-2.[19] The Mayor of Frankfort is thus a final decision-maker with respect to neither law enforcement policy nor police discipline and personnel matters. *See Warner v. City of Terre Haute, Ind.*, 30 F. Supp. 2d 1107, 1124 (S.D. Ind. 1998). Whatever he said to the Snyders and subsequently did or failed to do, his words and actions on one occasion do not suffice to show that the Mayor of Frankfort "adopted a policy of knowing about police misconduct and refusing to do anything about it." *Cf.* Compl. ¶ 135. The municipal liability claim against the City under Section 1983 thus fails.

### D. Count III – Conspiracy under 42 U.S.C. § 1985(3) Against All Defendants

Count III of the Complaint alleges under 42 U.S.C. § 1985(3) that all of the defendants engaged in a conspiracy to deny Plaintiff her civil rights. Compl. ¶ 163. To state a claim under this provision, a plaintiff must establish: (1) the existence of a conspiracy, (2) a purpose of depriving a person or class of persons of equal protection of the laws, (3) an act in furtherance of the alleged conspiracy, and (4) an injury to person or property or a deprivation of a right or privilege granted to U.S. citizens. *Xiong v. Wagner,* 700 F.3d 282, 297 (7th Cir. 2012). Despite employing language similar to that of Section 1983, Section 1985(3) has different legislative origins. As a codification of the post-Civil War "Ku Klux Klan Act," it has long been interpreted by the Supreme Court as reaching only conspiracies motivated by animus on the basis of race or another identifiable class. *See* Devin S. Schindler, *The Class-Based Animus Requirement of 42 U.S.C. § 1985(3): A Limiting Strategy Gone Awry?*, 84 Mich. L. Rev. 88, 89–90 (1985) (discussing the history of the provision's interpretation in the 20th Century).

---

[19] An exception may exist where, when provided by statute, some personnel matters are placed in the hands of a Merit Board or commission. Ind. Code § 36-8-3-5.

These limitations have survived into contemporary jurisprudence. The Supreme Court in *Griffin v. Breckenridge*, 403 U.S. 88 (1971), stressed the importance of avoiding the "constitutional shoals that would lie in the path of interpreting Section 1985(3) as a general federal tort law." 403 U.S. at 102. It therefore held that "[t]he language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* In *United Brotherhood of Carpenters and Joiners of America, Local 610, AFL-CIO v. Scott,* 463 U.S. 825 (1983), the Court further affirmed that, even if the statute may be extended to reach beyond animus based on immutable characteristics to encompass animus against groups based on their political views, it should not be extended further to reach economic or other discrimination and thus resemble an all-purpose conspiracy statute. 463 U.S. at 838–839. Applying this limiting principle, the Seventh Circuit has held that a plaintiff must demonstrate "class-based animus"—and that the classes cognizable under the statute include race, gender, religion, ethnicity, or political loyalty. *See Volk v. Coler,* 845 F.2d 1422, 1434 (7th Cir. 1988); *Xiong,* 700 F.3d at 297.

Neither the Supreme Court nor the Seventh Circuit has credited a "class of one" conspiracy claim under Section 1985(3), and such a broad interpretation would be inconsistent with the Supreme Court's command that the statute be construed in a limited manner. *See Griffin,* 403 U.S. at 102; *see also Axt v. City of Fort Wayne,* 2006 WL 3093235, at *4 (N.D. Ind. Oct. 30, 2006) ("A class of one is not a protected class for purposes of § 1985(3)"); *Am. Nat'l Bank and Trust Co. of Chi. v. Town of Cicero,* 2001 WL 1631871, at *12 (N.D. Ill. Dec. 14, 2001) ("While the 'class of one' may qualify under a § 1983 equal protection claim, plaintiffs

fail to cite, and this Court fails to find, any case stating that such a class qualifies for protection under § 1985.")

As discussed in connection with her equal protection claim, Plaintiff's allegations of gender-based animus are conclusory; those grounded in specific factual assertions are consistent with a theory of *personal* animus, but not that Plaintiff was targeted because she is a woman. *See supra,* § I(B)(3)(a) (citing Compl. ¶ 125). Just as the claim that she has been deprived equal protection on the basis of gender is groundless, so too is the claim that she was the victim of a conspiracy to deprive her equal protection on that basis. Since Plaintiff has set forth no claim that she suffered animus based on any of the other class distinctions recognized by the Seventh Circuit, her claim under Section 1985(3). The Frankfort Defendants' motion to dismiss is granted, on grounds that compel the dismissal of the claim against all other defendants as well.

**E. Count IV – Violation of 42 U.S.C. § 1986 by All Defendants**

Plaintiff's final federal claim arises under 42 U.S.C. § 1986, a provision that imposes liability for the intentional or negligent failure to prevent a conspiracy of the type prohibited by Section 1985(3). Liability under the two statutes is thus inextricably linked. "[I]n the absence of a viable claim under § 1985(3), a § 1986 claim cannot exist." *Hicks v. Resolution Trust Corp.*, 970 F.2d 378, 382 (7th Cir. 1992); *see also Smith v. Gomez,* 550 F.3d 613, 617–618 (7th Cir. 2008). Because we have dismissed the conspiracy claim under Section 1985(3), we likewise dismiss the Section 1986 claim against all defendants.

## II.    State Law Claims

Plaintiff's complaint includes four claims arising under Indiana law: intentional infliction of emotional distress (IIED), "conspiracy," actual fraud, and constructive fraud. Before turning to the merits of these allegations, we pause to address the limits of our jurisdiction.

The Complaint recites that the Court possesses federal question jurisdiction pursuant to 28 U.S.C. § 1331 over the four federal claims, and that it may also exercise supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367. Compl. ¶ 7. Federal courts may exercise supplemental jurisdiction over state law claims "that are so related" to pending federal claims "that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a); *Brown v. City of Milwaukee,* 288 F. Supp. 2d 962, 984 (E.D. Wisc. 2003). For state law claims to be part of the same "case or controversy" as federal claims, they must bear at least a "loose factual connection" to the federal claims, stemming from a "common nucleus of operative fact." *City of Chi. v. Int'l College of Surgeons,* 522 U.S. 156, 164–165 (1997); *Ammerman v. Sween,* 54 F.3d 423, 424 (7th Cir. 1995).

Here, the "fact pattern" giving rise to the federal claim is the Frankfort Defendants' response to Plaintiff's report of her sexual assault and their subsequent (non)investigation of the matter.  *See Didzerekis v. Stewart,* 41 F. Supp. 2d 840, 850 (N.D. Ill. 1999) (claims must share a central "fact pattern"). As both the Bolens and Crockett point out in their motions to dismiss, the state law claims against private individuals for acts not within this common factual nucleus fall outside the scope of our supplemental jurisdiction. *See* Crockett Br. 5; Bolen Br. 2–4. More specifically, we lack jurisdiction over allegations connected to the sexual assault itself. As the Northern District of Illinois explained in *Didzerekis v. Stewart,* 41 F. Supp. 2d 840 (N.D. Ill.

1999), an underlying crime committed by a third party and civil rights claims stemming from the allegedly unconstitutional police response to that underlying crime are factually distinct matters. 41 Supp. 2d at 850 (holding that supplemental jurisdiction does not exist) (citing *Hutchison ex rel. Baker v. Spink,* 126 F.3d 895, 902 (7th Cir. 1997). We therefore possess jurisdiction over the state law claims against private individuals only to the extent that their alleged actions bear some factual nexus to the Frankfort Defendants' (non)response to the sexual assault. We will further discuss the application of this jurisdictional limitation to state law claims against particular defendants as we address each claim in turn.

## A. Count V – Intentional Infliction of Emotional Distress

Plaintiff alleges that the "suspects" (Eli Smith, Rodney "Boomer" Smith, Trey Crockett, Dakota Beard, and Caira Bolen), Detective Hession, and the Frankfort Police Department as an entity are liable for intentional infliction of emotional distress (IIED). Compl. ¶ 289–314. At the outset, we note that we lack subject matter jurisdiction over the IIED claim against the five sexual assault suspects. The complaint predicates their liability on the following: "Boomer" Smith intentionally gave Plaintiff a beverage that caused her to pass out, the suspects "engaged in extreme and outrageous conduct by restraining and forcing themselves" on Plaintiff during the sexual assault, Bolen punched Plaintiff in the mouth during the sexual assault, and Bolen later vandalized Plaintiff's car, writing "Seven guys in one night. What the F*** Whore."[20] None of

---

[20] The Complaint itself makes use of asterisks in transcribing this message. In the interest of avoiding gratuitous profanity, we do the same. We take the Complaint to imply that the actual message on Plaintiff's car lacked asterisks, however.

these incidents are germane to the allegations of the Frankfort Defendants' misconduct underpinning the federal claims, and they are therefore dismissed without prejudice.[21]

### 1. Elements of the Claim Against Hession and the Frankfort Police Department

Remaining before us, then, are IIED claims against Detective Hession and the Frankfort Police Department. As to Hession, Plaintiff asserts the he inflicted emotional distress upon her when he insinuated that she had "asked for" the sexual assault, used expletives to refer to her parents in her presence, and failed to engage in a proper investigation. Compl. ¶ 296–298. The claims against the Police Department are more vague, stating only that the department, "and individuals and individual police officers acting in concert, should know, or should have known that by suppressing evidence, protecting the suspects with whom they have personal relationships and by not conducting a fair and unbiased investigation, that it [sic] would lead to additional emotional distress upon Snyder." *Id.* at ¶ 301.

In Indiana, a defendant is liable for the intentional infliction of emotional distress if he or she "(1) engages in extreme and outrageous conduct; (2) which intentionally or recklessly (3) causes (4) severe emotional distress to another." *Brown v. Indianapolis Hous. Agency,* 971 N.E.2d 181, 188 (Ind. Ct. App. 2012) (citing *Bradley v. Hall,* 720 N.E.2d 747, 752 (Ind. Ct. App. 1999)). In defining the type of "extreme and outrageous" conduct necessary to give rise to liability, Indiana courts have turned for guidance to commentary in the Second Restatement of Torts:

---

[21] There is no factual support whatsoever for Plaintiff's notion, expressed in both federal and state-law conspiracy claims, that a conspiracy against Plaintiff between the police and the perpetrators existed at the time of the sexual assault. Whether the perpetrators cooperated with the Frankfort Defendants in some manner afterward is a separate question.

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46; *see also Bradley,* 720 N.E.2d at 752–753; *Lachenman v. Stice,* 838 N.E.2d 451, 456–457 (Ind. Ct. App. 2005). The law thus imposes a "rigorous" standard of liability for the tort of IIED, *see Curry v. Whitaker,* 943 N.E.2d 354, 361 (Ind. Ct. App. 2011), and under certain circumstances the existence or absence of actionable conduct by the defendant can be decided as a matter of law. *See Creel v. I.C.E. & Assocs., Inc.*, 771 N.E.2d 1276, 1282 (Ind. Ct. App. 2002).

Exacting though the liability standard is, we cannot say at the pleading stage that the claim against Hession fails as a matter of law. Courts operating under the framework of the Second Restatement have found conduct similar to Hession's behavior towards Plaintiff in their initial interview to constitute IIED. In *Drejza v. Vaccaro,* 650 A.2d 1308 (D.C. 1994), the District of Columbia Court of Appeals addressed facts similar to those before us. There, a police officer assigned to interview a sexual assault victim treated her with "derision and scorn" throughout the interview, and he directly insinuated that her account was false because she had previously been in a relationship with the assailant.[22] 650 A.2d at 1309–1310. In reversing a grant of summary judgment against the plaintiff, the court found the context in which the

---

[22] Admittedly, the complaint and factual record in *Drejza* was more detailed in its allegations than Ms. Snyder's here. The *Drejza* plaintiff recounted specifics about the officer's cynical and dismissive course of questioning, and asserted that his demeanor throughout was wholly inappropriate, as if he "enjoyed" the entire process. 650 A.2d at 1309–1310. However, this case has advanced only to the motion to dismiss stage, unlike *Drejza,* which was an appellate review of a summary judgment order. We find the facts close enough to be persuasive on the question of whether the core officer conduct is "outrageous."

conduct occurred to be compelling, in three respects: the plaintiff's emotional state immediately following a dehumanizing sexual assault on her, the officer had knowledge of her susceptibility, and, finally, the officer occupied a position of authority and trust, making the sting of his egregious behavior all the more traumatic. *Id.* at 1310–1314. In light of the fact that the Second Restatement specifically recommends the consideration of both the unique vulnerability of a plaintiff and the defendant's abuse of a position of authority, the court in *Drejza* concluded that the elements of an IIED claim were present. *Id.* at 1313–1314 (citing Restatement (Second) of Torts § 46, comments e & f)). *See also Brandon ex rel. Estate of Brandon v. County of Richardson,* 624 N.W.2d 604, 621–625 (Neb. 2001) (finding that elements of IIED tort were satisfied as a matter of law—relying on the same Restatement provisions—where officer interviewing transgender victim made lewd sexual remarks, expressed disbelief of victim's account, and insinuated the assault was in fact consensual).

Although these cases are not binding on us, we find their application of nearly identical law to strongly analogous facts to be persuasive. *Cf. Drejza,* 650 A.2d at 1312 (elements of tort in District of Columbia match those of Indiana); *Brandon,* 624 N.W.2d at 620–621 (similar). Thus, we conclude that Plaintiff has successfully pled the element of "extreme and outrageous" conduct against Hession; we further conclude that she has adequately pled that this course of conduct caused her severe emotional distress. *See* Compl. ¶ 309–312. The cases the Frankfort Defendants cite in arguing against the presence of outrageous conduct here are not on point; they may hammer home the point that the IIED standard in general is a rigorous one, but their facts are not sufficiently analogous to compel dismissal of this complaint. *Cf. Curry,* 943 N.E.2d at 361 (neighbors did not act outrageously by installing surveillance camera, filing police reports, and "waging a campaign in the community against plaintiff"); *Conwell v. Beatty,* 667 N.E.2d

768, 777 (Ind. Ct. App. 1996) (sheriff did not engage in outrageous conduct towards deputy in holding press conference announcing deputy's arrest).[23] The IIED inquiry depends inescapably on "cultural norms and values," *see Creel,* 771 N.E.2d at 1282, and it is our judgment that contemporary society has come to recognize the profound emotional scars left by sexual assault and to abhor the barbarity of a police officer's treating a victim with callousness and derision.

## 2. Immunity

The allegations of the complaint, if substantiated, would give rise to a claim for intentional infliction of emotional distress against Defendant Hession if he were a private citizen. As appalling as his alleged conduct was, however, recovery against him and his employer is barred by law enforcement immunity.

The Indiana Tort Claims Act (ITCA) provides that tort claims may not be brought against government employees or entities in certain enumerated circumstances. Ind. Code § 34-13-3-3. As a statute in derogation of the common law, the ITCA is to be construed narrowly, *see Mangold ex rel. Mangold v. Ind. Dep't of Natural Res.*, 756 N.E.2d 970, 975 (Ind. 2001), but if one of its provisions applies to a suit, recovery under any theory is barred. *Ind. Dep't of Natural Res. v. Taylor,* 419 N.E.2d 819, 823 (Ind. Ct. App. 1981). Among the specific exclusions of the Act is the so-called "law enforcement immunity" provision, which provides immunity when a loss results from "the adoption and enforcement of or failure to adopt or enforce a law (including

---

[23] Frankfort Defendants also argue briefly that the element of "intentionality" has not been met. But specific proof (if direct proof of such a thing were even possible) that a defendant intended his conduct to cause distress is often rendered unnecessary by the principle that an actor may be presumed to intend the natural and probable consequences of his acts. Conduct of the type of which Hession is accused speaks for itself in this regard. *See Kraemer v. Harding,* 976 P.2d 1160, 1173 (Or. App. 1999) (noting that a jury could infer from the conduct itself that the "making of [sufficiently outrageous] statements was substantially certain to cause emotional distress").

rules and regulations), unless the act of enforcement constitutes false arrest or false imprisonment." Ind. Code § 34-13-3-3(8).

In determining whether Ind. Code § 34-13-3-3(8) provides immunity for a police officer, we first determine whether the officer was acting within the scope of his or her employment when the injury to a plaintiff occurred and, second, whether the officer was engaged in the "enforcement of a law" at that time. *Harness v. Schmitt,* 924 N.E.2d 162, 165 (Ind. Ct. App. 2010) (quoting *City of Anderson v. Davis,* 743 N.E.2d 359, 364 (Ind. Ct. App. 2001)).

A public employee's scope of employment consists of "activities involving the pursuit of the governmental entity's purpose." *King v. Northeast Security, Inc.*, 790 N.E.2d 474, 483 (Ind. 2003). It is beyond question, of course, that interviewing the alleged victim of a crime is ordinarily an activity well within the scope of a police officer's duties. *See* Ind. Code § 36-8-3-10 (establishing that among the duties of police are to "prevent offenses" and "detect and arrest criminals"). An officer may engage in misconduct to an extensive degree and still be within the scope of his employment for these purposes, so long as "his purpose was, to an appreciable extent, to further his employer's business, even if the act was predominantly motivated by an intention to benefit the employee himself." *Ellis v. City of Martinsville,* 940 N.E.2d 1197, 1209 (Ind. Ct. App. 2011) (citing *Stropes by Taylor v. Heritage House Children's Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 247 (Ind. 1989)). In light of this broad standard, we must conclude that Hession's conduct towards Plaintiff, no matter what personal motives animated it, nevertheless took place in the context of his performances of one of his paradigmatic professional duties. *See, e.g., Branson v. Newburgh Police Dep't*, 849 F. Supp. 2d 802, 806–808, 813 (holding that law enforcement immunity barred recovery against officers alleged to have inappropriately touched and sexually harassed the plaintiff during the execution of a search warrant).

It is also axiomatic that the enforcement of law is central to the duties of a police officer. "Enforcement" activities under Section 34-13-3-3(8) include "compelling or attempting to compel the obedience of another to laws, rules, or regulations, and the sanctioning or attempt to sanction a violation thereof." *Johnson ex rel. Indiana Dep't of Child Servs. v. Marion Cnty. Coroner's Office,* 971 N.E.2d 151, 158 (Ind. Ct. App. 2012). The investigation of crimes is a preliminary step in the "sanctioning" of their violation, and we thus conclude that it constitutes a law enforcement activity. Even the commission of an intentional tort, if it takes place within this context, is immunized. For instance, in *City of Anderson v. Weatherford,* 714 N.E.2d 181 (Ind. Ct. App. 1999), the Indiana Court of Appeals held that, even though the plaintiff had stated a valid IIED claim against police officers for publicly arresting him for no good reason in retaliation for an earlier dispute, law enforcement immunity nonetheless defeated liability. The court stated: "[W]hile we do not condone the officers' callous behavior in the case at bar, we cannot conclude that, as a matter of law, the officers' arrest of Weatherford was so incompatible with the performance of their employment as to be deemed outside the scope of their employment." 714 N.E.2d at 186; *see also Kemezy v. Peters,* 622 N.E.2d 1296, 1298 (Ind. 1993) (even *criminal* activity may be within the scope of employment for purposes of law enforcement immunity).

In her response to the Frankfort Defendants, Plaintiff cites two cases, both of which pertain to a distinction not relevant here. Both *Mullin v. Municipal City of South Bend,* 639 N.E.2d 278, 280 (Ind. 1994), and *Johnson ex rel. Indiana Department of Child Services v. Marion County Coroner's Office,* 971 N.E.2d 151, 159 (Ind. Ct. App. 2012), illustrate the principle that "following government policy is not the same as enforcing it." *Mullin,* 639 N.E. 2d at 283. Thus, when a city is sued for negligence in failing to send an ambulance in response to a

fire alarm, the city cannot argue that the plaintiff's claim that it was negligent in failing to follow its own policies is barred by "law enforcement" immunity. *Id.* An allegation that a coroner's office failed to comply with its own rules in transporting a dead body falls well outside the scope of such immunity, for the same reason. *See Johnson,* 971 N.E.2d at 159. These cases dispel confusion about the meaning of the statute's term "enforcement"—and they establish that enforcement consists of upholding the law in society at large rather than adhering to internal rules and regulations. *Id.* Plaintiff's counterargument answers a question that was never asked in this case, and it does nothing to avoid the conclusion that law enforcement immunity applies to the Frankfort police officers' investigation of the sexual assault claim—including, most centrally, Detective Hession's contacts with Plaintiff.[24]

## B. Count VI – Conspiracy

Count VI of the Complaint states a claim for conspiracy whose precise contours are difficult to determine. To the extent that the thrust of the claim can be distilled from its constituent parts—most of which are simply restatements of allegations set forth earlier in the Complaint—Plaintiff contends that all of the defendants engaged together in an illegal agreement to thwart the investigation of her sexual assault, to protect the perpetrators, and to "cover up" unspecified other unpunished rapes. Compl. ¶¶ 351, 353, 360.

A civil conspiracy is a "combination of two or more persons who engage in a concerted action to accomplish an unlawful purpose or to accomplish some lawful purpose by unlawful means." *K.M.K. v. A.K.*, 908 N.E.2d 658, 663 (Ind. Ct. App. 2009). As the Frankfort Defendants point out, there is no independent cause of action for civil conspiracy in Indiana. Frankfort Defs.'

---

[24] Plaintiff's IIED claim does not allege any other concrete actions constituting "extreme or outrageous" behavior; to the extent that any are alleged against the Frankfort Defendants, however, law enforcement immunity would likely defeat liability as to them as well.

Br. 31 (citing *Rosenbaum v. White,* 692 F.3d 593, 606 (7th Cir. 2012)). Rather, conspiracy may be a vehicle for recovery of damages from additional defendants if the plaintiff can establish that the defendants acted in concert with another party in the commission of an independent tort. *K.M.K.*, 908 N.E.2d at 663–664.

Here, the Complaint adequately alleges concerted action only against two defendants—Detectives Hession and Albaugh—whose joint misconduct is already encompassed by the claim that both of them deprived Plaintiff of the equal protection of the laws. *See supra,* § I(B)(3)(b). As we have already noted, Plaintiff's allegations are consistent with the inference that the remaining Frankfort Defendants, Chief Bacon and Mayor McBarnes, knew about the detectives' improper conflict of interest and did nothing to address it.[25] Nevertheless, satisfying the prerequisites of supervisory liability, though they are rigorous in Section 1983 cases, is not the same as establishing that a defendant *conspired* with his subordinates in pursuit of a joint aim. *Cf. Jones,* 856 F.2d at 992–993. And the allegations here do not permit such an inferential leap. In fact, the sole specific allegation against Mayor McBarnes in support of the claim appears to be that he made a false assertion about the rape kit processing to Plaintiff's family in good faith: "the Frankfort Mayor represented to Snyder and her family that the rape kit was taken down and securely stored based upon the representations made to him by the Frankfort Police Department." Compl. ¶ 324. Plaintiff alleges no concrete claim against Bacon at all in support of the conspiracy theory, and there is no factual warrant for reading Plaintiff's earlier allegations that Bacon failed to take disciplinary action against the officers as showing conspiracy rather than

---

[25] As already noted, however, Mayor McBarnes lacked the statutory authority over such conduct that would be necessary to impose supervisory liability on him. *See supra,* § I(B)(3)(b).

mere negligence or incompetence. *See* Compl. ¶ 64.[26] Plaintiff makes other broad accusations of conspiratorial behavior against the Police Department more generally: that it "conspired with individuals outside the Frankfort Police Department to suppress [the] evidence" and that its officers, in collusion with the perpetrators, have "repeatedly approached potential witnesses and threatened them not to talk about this rape in further conspiracy to cover up these series of rapes." Compl. ¶¶ 351, 360. These assertions, however, are based only on "information and belief" or on nothing at all—insufficient grounds to survive a motion to dismiss, especially in light of the new rigor of with which Rule 8 has been interpreted in recent years. *See Twombly,* 550 U.S. at 556–557 (discussing pleading standards for conspiracy under the Sherman Act). The Plaintiff has therefore failed to set forth a viable civil conspiracy claim against the Frankfort Defendants other than Hession and Albaugh, against whom a conspiracy claim would clearly be duplicative.

The Complaint similarly fails to make a viable prima facie showing of "concerted action" with respect to the private individual defendants. Caira Bolen, Plaintiff alleges, "contributed to the sexual assaults" by holding down Plaintiff and by failing to call the police for assistance "in an effort to hide the acts of her friends." Compl. ¶ 317–318. This may demonstrate Bolen's complicity in the sexual assault, but it does not support an inference of her involvement in the claims validly before the court.[27] As to "Boomer" Smith and Autumn Dick (his alleged girlfriend), the Complaint asserts that Dick concocted an alibi for Smith on the night of the assault—and that Smith initially claimed he had had no sexual contact with Plaintiff before admitting contact but insisting it was "consensual." Compl. ¶¶ 333, 335. Again, such behavior, if

---

[26] Bacon allegedly told Snyder's family that he would have to deliberate before taking action because he "knew nothing about the detective side of the case because he has never been a detective before." Compl. ¶ 64.

[27] Claims for assault and battery and several other state-law torts were included in Plaintiff's original complaint, but she has since deleted them, stating her intention to bring a suit in state court seeking recovery for the sexual assault itself and related state-law claims. *See* Docket No. 80 at 2.

proven, is consistent with a theory that Dick and Smith colluded for the purpose of protecting Smith from rape charges, but it gives rise to no plausible inference that the two conspired with the police to deprive Plaintiff of her civil rights. Lastly, Plaintiff notes in support of the conspiracy claim that Boomer Smith has previously been accused of rape by another woman, and that Crockett is currently in prison on unrelated charges. Compl. ¶¶ 337–338. These allegations are wholly irrelevant to a conspiracy claim.[28]

Because Count VI merely duplicates an existing claim with respect to Hession and Albaugh and fails to allege plausibly concerted conspiratorial action in support of an independent tort by any of the other defendants, it must be dismissed in its entirety.

## C. Counts VII and VIII -- Actual and Constructive Fraud

Counts VII and VIII of the complaint contain claims of actual and constructive fraud against all defendants.[29] Specifically, it alleges that the Police Department fraudulently told Plaintiff's family that the medical pictures and records from the rape investigation would be submitted to the prosecutor's office and fraudulently told both Plaintiff's family and Mayor McBarnes that the rape kit had been submitted to the Indiana State Police crime lab. Compl. ¶¶ 367–371. Additionally, it alleges that Defendant Autumn Dick "provided false and misleading information" to the police regarding Boomer Smith's participation in the sexual assault. *Id.* at 373. Because the actual and constructive claims suffer from the same fatal defect—their failure to show reliance and harm—we consider them together.

---

[28] Plaintiff additionally makes no plausible allegations of conspiracy to engage in actual or constructive fraud— claims we address below. At any rate, no recovery of damages for conspiracy on the fraud claims is possible because Plaintiff fails to state a claim for the underlying tort. *See supra,* § II(C).

[29] Among the private individual defendants, the Complaint alleges fraudulent behavior only against Defendant Autumn Dick. The fraud claims against Defendants Eli Smith, Boomer Smith, Dakota Beard, Caira Bolen, and Trey Crockett are accordingly dismissed.

To prevail on a fraud claim for actual fraud, a plaintiff must establish that there was: (1) a material misrepresentation of past or existing fact which (2) was untrue, (3) was made with knowledge of or in reckless ignorance of its falsity, (4) was made with the intent to deceive, (5) was rightfully relied upon by the complaining party, and (6) which proximately caused injury or damage. *Lawyers Title Ins. Corp. v. Pokraka,* 595 N.E.2d 244, 249 (Ind. 1992); *Angel v. Powelson*, 977 N.E.2d 434, 444–445 (Ind. Ct. App. 2012). The tort of constructive fraud encompasses omissions and failures to disclose as well as affirmative misrepresentations, but it applies to a narrower class of defendants—those who owe plaintiffs a "duty existing by virtue of the relationship between the parties." *Comfax Corp. v. N. Am. Van Lines, Inc.*, 587 N.E.2d 118, 125 (Ind. Ct. App. 1992). "In constructive fraud, the law infers fraud from the relationship of the parties and the circumstances which surround them. . . . This special relationship is shown when the parties have fiduciary duties to each other." *Id.* There is no definitive list of the "special" relationships giving rise to fiduciary duties, but they include "attorney and client, guardian and ward, principal and agent, pastor and parishioner," and close familial relationships. *See Lucas v. Frazee,* 471 N.E.2d 1163, 1166–1167 (Ind. Ct. App. 1984).

Counts VII and VIII both fail as a matter of law because they include no allegations that Plaintiff relied to her detriment on any false statement or omission. "Detrimental reliance is often the dispositive element under Indiana law, because the plaintiff cannot recover for fraud unless he reasonably relied on the defendant's representations." *Baxter v. I.S.T.A. Ins. Trust,* 749 N.E.2d 47, 52 (Ind. Ct. App. 2001). Plaintiff makes no reference to reliance at all; the closest she comes is a general allegation that "[a]s a result of such false and fraudulent representations . . . Snyder was damaged." Compl. ¶ 374. Plaintiff's argument in response to the motion to dismiss on this issue is no more convincing. She contends only vaguely that "[h]ad Plaintiff not reasonably

relied on Frankfort Defendant's [sic] misrepresentations, she would have taken further and appropriate action." Where, as here, a complaint contains no facts that could support an inference of reliance—and fails even to recite the element of reliance in conclusory fashion—dismissal is warranted. *See, e.g., McCalment v. Eli Lilly & Co.*, 860 N.E.2d 884, 896 (Ind. Ct. App. 2007).

Although we dismiss the fraud claims against all defendants, it is important to differentiate here between dismissal with prejudice and dismissal without prejudice. Plaintiff's allegation that Defendant Autumn Dick lied to the police categorically fails to state a claim for fraud. Plaintiff cannot have relied on such a statement—let alone pled as much in her complaint—because Autumn Dick's misrepresentation was not directed at her. Because Plaintiff is not a proper party to bring a fraud claim against Dick, that allegation is dismissed with prejudice. *See Lycan v. Walters,* 904 F. Supp. 884, 897 (S.D. Ind. 1995) (holding that fraud claim fails where, among other reasons, the defendants had no "personal contact or written communication with any of the plaintiffs"). With respect to the allegations against the Frankfort Defendants,[30] it is difficult to conceive how Plaintiff could convincingly distinguish between harm suffered as a result of reliance on the misrepresentations of the Frankfort Defendants about the investigation and the harm she suffered as a result of the ineffectual investigation itself. But because it is not *impossible* to do so as a matter of law, we dismiss these allegations without prejudice. *Cf. McCalment,* 860 N.E.2d at 896 (dismissing a claim where "the facts alleged . . . are incapable of showing detrimental reliance").

---

[30] In contrast with the statements Dick made to the police, Plaintiff could state a claim for fraud based on representations made to her parents if the speaker should reasonably have anticipated that Plaintiff would hear and act on them. *See* 14 Ind. Law Encyc. Fraud § 12.

## **Conclusion**

For the foregoing reasons, we conclude as follows with respect to the motions to dismiss:

(1) Count I – Constitutional claims for deprivation of privileges or immunities of citizenship, due process, and equal protection of the laws (gender discrimination). The motions are GRANTED with respect to all defendants. Count I is dismissed WITH PREJUDICE.

(2) Count II – Equal protection ("class of one" theory). The motions are DENIED with respect to Defendants Robert Hession, Jason Albaugh, and Troy Bacon, and GRANTED with respect to all other defendants. Count II with respect to Defendants City of Frankfort, Frankfort Police Department, Rodney Smith, Eli Smith, Trey Crockett, Dakota Beard, Autumn Dick, Chris McBarnes, and Caira Bolen is dismissed WITH PREJUDICE.

(3) Count III – Conspiracy under 42 U.S.C. § 1985(3). The motions are GRANTED with respect to all defendants. Count III is dismissed WITH PREJUDICE.

(4) Count IV – Violation of 42 U.S.C. § 1986. The motions are GRANTED with respect to all defendants. Count IV is dismissed WITH PREJUDICE.

(5) Count V – Intentional Infliction of Emotional Distress. The motions are GRANTED with respect to all defendants. Count V with respect to Defendants Frankfort Police Department, City of Frankfort,  Robert Hession, Jason Albaugh, Troy Bacon, and Chris McBarnes are dismissed WITH PREJUDICE. Count V with respect to Defendants Rodney Smith, Eli Smith, Trey Crockett, Dakota Beard, Autumn Dick, and Caira Bolen are dismissed WITHOUT PREJUDICE.

(6) Count VI – Conspiracy. The motions are GRANTED with respect to all defendants. Count VI is dismissed WITH PREJUDICE.

(7) Counts VII and VIII – Actual Fraud and Constructive Fraud. The motions are GRANTED with respect to all defendants. Counts VII and VIII with respect to Defendant Frankfort Police Department are dismissed WITHOUT PREJUDICE. Counts VII and VIII with respect to all other defendants are dismissed WITH PREJUDICE.

The only claim that remains before us is therefore that alleging an equal protection violation, on a "class of one" theory, against Defendants Hession, Albaugh, and Bacon. All other claims have been dismissed.

IT IS SO ORDERED.

Date: _____03/14/2014_____

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Matthew J. Elkin
melkin1@sbcglobal.net

David Lawrence Whitsett, II
david@whitsettlaw.com

Andrea Lynn Ciobanu
CIOBANU LAW, PC
aciobanulaw@gmail.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Rosemary L. Borek
STEPHENSON MOROW & SEMLER
rborek@stephlaw.com