UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SAMANTHA SNYDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-00576-SEB-DKL |
| | ) | |
| JASON ALBAUGH Detective, | ) | |
| ROBERT HESSION Detective, | ) | |
| TROY BACON Chief, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment [Docket No. 114], filed on October 7, 2015. For the reasons detailed herein, we hereby **GRANT** Defendants' motion and enter judgment in their favor.

**Factual Background**

This cases arises out of an alleged sexual assault occurring in April 2012 and the ensuing investigation conducted by officers in the Frankfort Police Department. Plaintiff Samantha Snyder claims that, after suffering a sexual assault at the hands of three men—Dakota Beard, Eli Smith, and Trey Crockett—she was denied equal treatment under the law by Defendants Detective Robert Hession and Major Jason Albaugh when they

1

intentionally mishandled the assault investigation to avoid charging the suspects with whom they had personal relationships.

### A. The Sexual Assault

Snyder has alleged that on April 4, 2012, after taking a large dose of Klonopin,[1] she attended a party at the home of Eli and Rodney "Boomer" Smith where Boomer offered her an "unknown substance" to drink. Thereafter, he escorted her to his bedroom where she began to feel sick and lost consciousness. When she regained consciousness, Dakota Beard, Eli Smith, and Trey Crockett, were restraining her and sexually assaulting her. Although her ability to resist the sexual assault was hampered by the lingering effects of her intoxication, she eventually succeeded in leaving the bedroom and the party, and immediately contacted her father, Brent Snyder, for help, who in turn contacted the Frankfort Police. Snyder was then taken to St. Vincent Hospital in Frankfort, Indiana.

### B. The Investigation

The Frankfort Police Department dispatched Det. Robert Hession to the hospital to undertake an investigation into the alleged sexual assault. Det. Hession interviewed Snyder, which session he described as "unclear, sometimes inconsistent and sketchy."

---

[1] Klonopin (or clonazepam) is a benzodiazepine used to treat seizures, panic disorders and anxiety in adults and children. Because of its ability to produce a euphoric high, Klonopin is often abused by those with no legitimate medical need for the drug.

Hession Aff. ¶ 7.[2] Later that morning, he also interviewed Caira Bolen and Sara Ummel, two friends of Snyder's who had attended the April 4, 2012 party. According to Det. Hession, both Caira and Sara contradicted Snyder's version of events, reporting that Snyder was "flashing" the men at the party and "giving [them] shots from her boobs." Sara said she saw Snyder go into Rodney "Boomer" Smith's room for approximately half an hour, after which Boomer reported that he and Snyder had had sex. Both Caira and Sara also reportedly saw Snyder enter Eli Smith's room with Dakota Beard. Each friend offered her own opinion as to Snyder's consent.[3]  Det. Hession also interviewed Brittany Hoffman, another party-goer who had been told by Sara Ummel of Snyder's sexual assault allegations.

After taking these statements, Det. Hession traveled to the neighborhood where the party had taken place, where he found Boomer Smith, Eli Smith, and Dakota Beard. All three agreed to return to the police station with Det. Hession to give statements regarding the party and alleged assault. Eli Smith told Det. Hession that Snyder had been "messed up" on pills and that he had witnessed her having what he believed to be consensual sex with Dakota Beard during the party. He denied seeing anyone else have sex with her and denied having had sex with Snyder himself. He also voluntarily

---

[2] Plaintiff has responded that, at the time of the interview, she was still in pain, noticeably distraught, hysterical, and confused, given that the sexual assault had just occurred. In addition, she maintains that her memory was fuzzy due to the pain medication she was receiving as well as the still-lingering effects of the Klonopin she had ingested.

[3] Sara stated that although Snyder was "falling down intoxicated, in her opinion, [Snyder] knew what she was doing" and Ciara stated that Snyder appeared to be pulling Dakota Beard into the bedroom. Of course, the issue of legal consent is not an issue before this court; thus, we need not determine the appropriate weight to be given to the opinions of two underage party-attendees on the issue.

provided a DNA sample. Dakota Beard also described Snyder as being "messed up," "drunk," and "stumbling around" at the party. He said that Snyder had led him to a bedroom where they engaged in consensual intercourse. Caira Bolen thereafter entered the bedroom and struck Snyder in the face. Beard helped Snyder clothe herself and laid her down on the couch. He too volunteered to provide a DNA sample. Boomer Smith described Snyder as "hammered" and "pilled out" at the party. He denied having had sex with her and refused to provide a DNA sample.

Later that afternoon, Det. Hession returned to St. Vincent Hospital where he informed Snyder's parents that the statements of those he had interviewed did not support Snyder's version of events, and he requested to have another interview with Snyder. By this time, the Clinton County Victim Advocate, Fran Lanum, had arrived and Snyder requested that he be present for any further interviews. Based on that request, Det. Hession declined to conduct a second interview of Snyder. While at the hospital, Det. Hession obtained Snyder's rape kit and entered it, along with the DNA samples taken from Eli Smith and Dakota Beard, into evidence at the police department.

Ten days later, on April 14, 2012, Det. Hession interviewed with Trey Crockett, who stated that Snyder and Boomer Smith had left the party together for about half an hour and that he (Crockett) had later seen Snyder lying naked in a room with Eli Smith and Dakota Beard, both of whom admitted to Crockett that they had had sex with Snyder. Crockett denied having had sex with Snyder himself and claimed to have left the house party just after seeing Eli and Dakota with her.

4

On April 19, 2012, out of growing concern and frustration with the investigation, Samantha Snyder's parents lodged a complaint with the Frankfort Chief of Police Troy Bacon. Snyder maintains that her father informed Chief Bacon that both Det. Hession and his supervisor, Maj. Albaugh, had personal relationships with the suspects, which were hampering the investigation. Chief Bacon denies having been informed of any conflicts of interest and maintains that Brent Snyder complained only of Det. Hession's implication that the sexual assault may have been consensual, his premature conclusion of the investigation's outcome, and his lack of thoroughness and professionalism in investigating the case. Chief Bacon summarized those complaints in a memorandum he directed to Maj. Albaugh.

Four days later, on April 23, 2012, Maj. Albaugh spoke by phone with Brent Snyder, during which conversation they discussed Mr. Snyder's complaints. Mr. Snyder informed Maj. Albaugh that no DNA sample had been taken from Boomer Smith. Thereafter, Maj. Albaugh directed Det. Hession to obtain a DNA sample from Boomer, either voluntarily or by search warrant. On May 2, 2012, Boomer volunteered to provide a DNA sample upon request. After receiving notice that the rape kit and all accompanying DNA samples were ready for transport, Maj. Albaugh delivered the evidence to the State Police Laboratory for forensic testing.

On May 3, 2012, Det. Hession submitted his case report together with copies of the recordings of all the interviews to the prosecutor's office. The next day Brent Snyder contacted Det. Hession to inquire about the progress of the investigation and to advise

5

him that Trey Crockett had reportedly been making inconsistent statements about the assault to one Courtney Mooneyhan, the owner of a local consignment shop. Upon learning this, Det. Hession spoke with Mooneyhan, who told him that Crockett had suggested that Eli Smith and Dakota Beard may have "taken advantage" of Snyder during the party. Thereafter, Det. Hession spoke directly with Crockett, who told Hession that he had not seen Boomer have sex with Snyder, that he had "caught a glimpse" of Dakota having sex with her, and that he had seen Eli Smith lying in bed with her. He also stated that he assumed all of the sex was consensual despite Snyder being clearly intoxicated at the time.

Sometime thereafter, Det. Hession was again contacted by Brent Snyder, who had a copy of a recorded a conversation he had had on his cell phone with Crockett. Det. Hession maintains that the recorded conversation did not reveal any new evidence, but that he nevertheless forwarded the recording to the prosecutor's office along with his other investigative interview recordings. Ms. Snyder maintains that at multiple points during the recording, Trey Crockett indicates that Ms. Snyder could not have consented to having sex.

Months later, on August 6, 2012, Det. Hession received notice from the State Police Laboratory that Boomer Smith's DNA sample had been positively matched to the DNA found in Snyder's rape kit. Det. Hession contacted the prosecutor's office and was instructed to conduct another interview of Boomer. During the August 15, 2012 interview, Boomer told Det. Hession that he wished to "take back" his prior statement,

6

whereupon he admitted to having had sex with Snyder on the night of the party, but he represented that it had been consensual. He also stated that he had previously lied because, at the time of the party, he was in a relationship with Maj. Albaugh's step-daughter, Autumn Dick, who was unaware that he had had sex with Ms. Snyder.

Following the interview, Det. Hession transmitted this information to the prosecutor's office and informed Mr. Snyder that any future inquiries regarding the case should be directed to that office. Thereafter, Dep. Prosecutor Laura Zeman informed the Snyder family that they would not be pursuing charges against the suspects due to the anticipated problems with proving their guilt beyond a reasonable doubt.

## C. The Alleged Investigatory Deficiencies

Ms. Snyder claims that Det. Hession purposefully mishandled the investigation based on his and Maj. Albaugh's personal relationships with the suspects. She has cited several short-falls in this regard.

First, Ms. Snyder maintains that mid-way through her initial interview with Det. Hession, Hession turned off his tape recorder and asked her whether she had consented to having sex, saying that "girls that wear shirts that are too low cut and shorts that are too short give guys the wrong impression." Snyder Dep. 47:7–12. He also asked whether Snyder was "crying rape" because she was ashamed of having had sex with a black man. *Id.* Hession does not dispute that he turned off his tape recorder mid-interview, but claims that it was an interview technique he often employed in an effort to emphasize to the interviewee the importance of telling him the truth. He does, however, deny making any

7

comments regarding girls wearing provocatively-cut clothing or Ms. Snyder's possible embarrassment in having had sex with a black man.

Ms. Snyder also faults Det. Hession for failing to conduct a second interview with her. She maintains that she should have been interviewed after she had had at least two full sleep cycles, given that her initial interview was conducted when she remained "traumatized" and "slipping in-and-out of consciousness." Moreover, she asserts that it was both inappropriate and unusual for Det. Hession to deny her request for a victim advocate to be present during the second interview. Det. Hession rejoins that, based on his experience, victim advocates "sometimes [take] over the interview for the purposes of 'advocating' for the victim," which prevents the investigator from gathering relevant and necessary information. Thus, Det. Hession said that he believed that if victim advocate were present, he would be unable to obtain truthful responses from Snyder regarding the events in question.

Ms. Snyder also asserts that Det. Hession erred by never visiting, searching, or securing Eli and Boomer Smith's residence, thereby failing to collect key evidence from the crime scene. Det. Hession has explained that, based on his initial discussions with Brittany Hoffman, Sara Ummel, and Caira Bolen, a search of the scene of the alleged assault would have been a "waste of time" because news of the allegations was rapidly spreading among the party-goers, giving the suspects ample time to destroy or dispose of any remaining evidence before a search could be conducted.

8

Ms. Snyder also cites Det. Hession's failure to properly document her known injuries. Specifically, she maintains that although she sustained vaginal and anal tears as well as bruising on her arms and legs during the assault, Det. Hession's case report makes no mention of the injuries or of discussions he conducted with Snyder's nurse, Nora Thatcher. Det. Hession has denied seeing any bruising during his interviews with Ms. Snyder and maintains that her medical records were incomplete at the time he visited the hospital. He also maintains that while investigating officers will on occasion retrieve medical records and forward them to the prosecutor's office with their investigatory reports, it is not required that such be included, particularly in light of the prosecutor's ability to later subpoena the records, if necessary.

Finally, Ms. Snyder maintains that Det. Hession failed to provide the prosecutor's office with the audio recording taken by Brent Snyder containing Trey Crockett's statements, including that she had not consented to the sexual assault. Plaintiff avers that the recording provided by Brent Snyder, which was thirty-two minutes in length, contained multiple statements during the first ten minutes conveying Crockett's opinion of her (Plaintiff's) ability to consent to the assault, while the recording forwarded by Det. Hession to the prosecutor's office omitted that portion of the recorded conversation. Det. Hession maintains that, prior to the filing of this lawsuit, he had never heard the allegedly-omitted portion of the recording and that during the investigation he forwarded all of what he had been given by Brent Snyder.

### D. The Alleged Conflicts of Interest

Ms. Snyder contends that the mishandling of the investigation by Det. Hession and Maj. Albaugh was due to their personal relationships with the suspects.

It is undisputed that Maj. Albaugh's step-daughter, Autumn Dick, was at the time of the events in question involved in a romantic relationship with Rodney "Boomer" Smith. Ms. Snyder maintains that this fact represents a material conflict of interest, which affected the thoroughness and outcome of the investigation. Maj. Albaugh denies that it had any effect. Autumn is his wife's daughter from a previous marriage from whom he is estranged and with whom he has had no interactions during in the past three to five years. Further, Maj. Albaugh maintains that he has had no social relationship with Boomer Smith, whom he says he generally dislikes, and that his last contact with Boomer was two-months prior to the investigation, when he spotted Boomer driving without a valid license and had him arrested. He also maintains that when he was notified of the positive match between Boomer's DNA sample and Snyder's rape kit, he was the officer who ordered Det. Hession to arrest Boomer.

It is undisputed that, prior to the investigation, Det. Hession was acquainted with Dakota Beard's father and Trey Crockett. Beard's father operates a tow-truck and has in the past responded to towing calls made by Det. Hession when he was a patrol officer. Det. Hession also responded in his official capacity as a patrol officer to several incidents involving Crockett when Crockett was a juvenile. As a result, Det. Hession usually dealt with Crockett's grandparents, who were his legal guardians. Ms. Snyder maintains that

Det. Hession's relationship with Crockett is actually more extensive as evidenced by the fact that Crockett has Det. Hession's cell phone number on his speed dial and because Det. Hession has in the past described Crockett as "a good kid who just hangs out with the wrong people." Det. Hession describes his relationship with Crockett as "a distant professional relationship necessitated by [Crockett's] frequent brushes with the law." He does not view Crockett's having his cell phone number as unusual, given that Det. Hession has handed out "hundreds" of business cards containing that number to various people in the community.

### E.  The Instant Litigation

On April 8, 2013, Plaintiff filed this suit against various defendants, including the suspects of the alleged assault, the Franklin Police Department, Chief Troy Bacon, Maj. Jason Albaugh, and Det. Robert Hession, alleging numerous state law claims. See Dkt. 1 (Complaint). The Complaint eventually was amended to add a number of federal claims. See Dkt. 63 (Third Amended Complaint). Defendants filed motions to dismiss Plaintiff's Third Amended Complaint, which we granted in part and denied in part in our March 14, 2014 Order. Dkt. 82. What remains are Plaintiff's individual capacity claims, brought pursuant to 42 U.S.C. § 1983, against Chief Bacon, Maj. Albaugh, and Det. Hession, alleging that they violated Plaintiff's equal protection rights under the Fourteenth Amendment to the United States Constitution by purposefully mishandling the investigation into the alleged sexual assault. On October 7, 2015, Defendants filed the Motion for Summary Judgment [Docket No. 114] currently before us, arguing that they

had not violated Plaintiff's constitutional rights and that they were entitled to qualified immunity. The motion was fully briefed as of December 21, 2015, and is now ripe for disposition by this Court.

## Legal Standard

Federal Rule of Civil Procedure 56 provides that summary judgment should be granted when the record evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323 (1986). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.,* 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita,* 475 U.S. at 586, will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

**Discussion**

Plaintiff has claimed that Defendants, acting in their individual capacities, denied her rights to equal protection under the law and that their acts and omissions "were done for reasons of a personal nature and were unrelated to the duties of [their] positions." Third. Am. Compl. ¶ 140. More specifically, she charges Defendants with having purposefully mishandled the investigation into her sexual assault claim in order to avoid charging the suspects based on their personal relationships with the officers.

This type of equal-protection claim is properly analyzed as a "class-of-one" claim in that it asserts that Plaintiff suffered discrimination without regard to membership in any specific, identifiable group, such as based on her race or gender. *Enquist v. Oregon Dep't of Agriculture*, 553 U.S. 591, 601 (2008).[4] The Supreme Court discussed the requirements of class-of-one claims in *Village of Willowbrook v. Olech*, explaining that a plaintiff must establish that she has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. 562, 564 (2000).

Given the significant discretion vested in police officers allowing them to properly effectuate their duties—by deciding whom to investigate, whom to arrest, and whom to merely warn, or in deciding how to allocate limited police resources across

---

[4] Defendants assert entitlement to qualified immunity. Given the nature of Plaintiff's equal protection claim, we deem it appropriate to follow the *Saucier* approach by first deciding whether the facts presented by plaintiff make out a constitutional violation before turning to questions of immunity. *See Saucier v. Katz*, 533 U.S. 194 (2001); *Pearson v. Callahan*, 555 U.S. 223 (2009).

neighborhoods, commercial establishments, residences, and particular individuals—class-of-one claims against law enforcement officers are subject to an even higher standard of proof. *See Enquist*, 553 U.S. at 603–04. The precise contours of this higher standard of proof, however, remain uncertain, both within and without the Seventh Circuit. *See Black Earth Meat Market, LLC v. Vill. of Black Earth*,—F.3d—, 2016 WL 4468085, at *7 (7th Cir. Aug. 24, 2016) (describing the law on this point as "up in the air."). The Seventh Circuit, sitting *en banc*, in *Del Marcelle v. Brown Cty. Corp.*, attempted to clarify and simplify the law on this point, but failed to formulate a single standard. Their five-to-five split decision deprived the case of precedential significance; nevertheless, the court noted, "[t]he law concerning 'class of one' equal-protection claims is in flux, and other courts faced with these cases may find the discussion…helpful." 680 F.3d 887, 888 (7th Cir. 2012) (*per curiam*). Three opinions were handed down: (1) the lead opinion, authored by Judge Posner and joined by Judges Kanne, Sykes, and Tinder ("Posner Opinion"); (2) a concurring opinion, authored by then Chief Judge Easterbrook ("Easterbrook Opinion"); and (3) a dissenting opinion, authored by current Chief Judge Wood and joined by Judges Flaum, Rovner, Williams, and Hamilton ("Wood Opinion").

The five judges joining in the Wood Opinion ruled that a plaintiff presenting a class-of-one case should be required to plead and prove the following: "(1) plaintiff was the victim of intentional discrimination, (2) at the hands of a state actor, (3) the state actor lacked a rational basis for so singling out the plaintiff, and (4) the plaintiff has been injured by the intentionally discriminatory treatment." *Del Marcelle*, 680 F.3d at 913

14

(Wood, J.).  Under this standard, a plaintiff is required to demonstrate that an officer's conduct was intentional *and* that it lacked a rational basis, which showing requires more than simply proving that the officer exercised the discretion granted to him. *Id.* The Wood Opinion suggests that *one* set of facts on which a plaintiff might rely to establish the absence of rational basis would be to show that the officer's course of conduct was motivated by personal animus or illegitimate motives unrelated to the officer's duties. *Id.* at 913–14. However, that is not the only path to establishing liability; for instance, a plaintiff may also establish a lack of rational basis through evidence that an officer inexplicably deviated from a clear standard within the profession. *Id.*

In contrast, the four judges joining in the Posner Opinion ruled that "the plaintiff [should] be required to show that [s]he was the victim of discrimination intentionally visited on [her] by state actors who knew or should have known that they had no justification, based on their public duties, for singling [her] out for unfavorable treatment—who acted in other words for personal reasons, with discriminatory intent and effect." *Del Marcelle.*, 680 F.3d at 889 (Posner, J.) (italics omitted).  Under the Posner standard, no matter how irrational, egregious, or "silly" an officer's conduct may be, a plaintiff would be unable frame a viable equal protection claim without showing that the officer, "acting from personal motives, with no justification based on [his] public duties, intend[ed] to disfavor the plaintiff." *Id.*

Of these standards, the Wood Opinion has been described as "the least demanding," given that it does not *require* a showing of personal animus or illegitimate

motives, but instead offers that as one possible pathway, of many, to establish irrationality. *See Charleston v. Bd. of Trustees of Univ. of Ill. at Chic.*, 741 F.3d 769, 775 (7th Cir. 2013). In our case, the existence of multiple pathways by which to establish irrationality is beside the point, given that Plaintiff has specifically alleged that Det. Hession and Maj. Albaugh intentionally stifled or thwarted the investigation based on their personal relationships with the suspects. In light of Plaintiff's allegation that Defendants acted out of personal animus, we ruled in our March 2014 Order that she had satisfied either standard. We also noted that we viewed the Posner Opinion as more closely aligned with the Seventh Circuit's pre-*Del Marcelle* precedent. See Dkt. 82 at 29 (citing *Hilton v. City of Wheeling*, 209 F.3d 1005 (7th Cir. 2000)).

On summary judgment, Defendants argue that the Posner formulation is too lenient in that it would permit a plaintiff to proceed simply on the accusation that the defendants' motive was malicious, without regard to whether their taken action was irrational. *See also Del Marcelle*, 680 F.3d 887, 918 (Wood, J.) (describing the approach as "some kind of 'rational-basis minus' level of review"). This is not how we understand the Posner Opinion. It would require proof not only of personal motivation for an officer's actions, but also that those actions lack a justification or some relation to the officer's official duties. *Id.* at 889 (Posner, J.). We repeat what we wrote in prior Order: the *Del Marcelle* opinions are without precedential effect; therefore, rational basis review remains a part of any class-of-one claim. *See Miller v. City of Monona*, 784 F.3d 1113, 1123 (7th Cir. 2015). We can forego a discussion of "rational basis" as it pertains to

16

class-of-one equal protection claims because, as we demonstrate below, Plaintiff has entirely failed to establish any irrationality, no matter the analytical method that applies.

Plaintiff has predicated her claim of irrationality as to Defendant's actions by attempting to demonstrate that they were motivated by their personal relationships with the accused. We forewarned Plaintiff in our prior Order, noting that though these allegations survived a motion to dismiss, "Plaintiff will likely require a more complete and persuasive evidentiary showing, of course, to prevail on the merits or survive summary judgment." Dkt. 82 at 20 n.13. Indeed, as has often been said "summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). The pleadings, buttressed only by theories and speculation, do not create genuine disputes of material fact forestalling summary judgment. *Hedberg v. Ind. Bell Telephone Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

In establishing the alleged personal relationships and their effect on the investigation, Plaintiff has fallen well short of the required mark. In response to Defendants' motion for summary judgment, Plaintiff primarily repeated the allegations set out in her pleadings without further evidentiary support beyond her father's and her own deposition testimony—which incorporated almost entirely hearsay statements by

others.[5] As a result, the evidence regarding the alleged relationships remains largely undisputed.

It is undisputed that Det. Hession knew both Trey Crockett and Dakota Beard's father prior to the investigation. However, there is no evidence before us to establish that these relationships were anything other than those reflecting Det. Hession's position as a police officer. Det. Hession had come into contact with Trey Crockett due to Crockett's frequent brushes with the law as a juvenile. Det. Hession thus interacted not only with Crockett, but with Crockett's grandparents. There is no dispute as to the claims that Crockett likely had his cell phone number or that he believed Crockett was a good kid who had made poor choices. There is also nothing untoward or improper with regard to these facts, assuming they are true. Det. Hession has explained that he makes a practice of giving his phone number, via his business card, to "hundreds" of people with whom he interacts as an officer and, further, that he not infrequently describes many of the juveniles with whom he has come into contact as "good kids." Likewise, Det. Hession concedes that prior to the investigation he had interacted professionally with Dakota Beard's father, who operated a tow-truck as a business and was occasionally engaged by the police department to move vehicles that were obstructing traffic. He maintains that his interactions with Mr. Beard were limited to such professional encounters.

---

[5] Specifically with regard to Det. Hession's relationship with Trey Crockett, Plaintiff asserts that the two were "friends" and that Det. Hession "helped Crockett out of a number of situations," see Pl.'s Resp. at 17, but the only evidence she offers in support of these assertions is Brent Snyder's deposition testimony, which relies exclusively on the out of court statements of others and displays no personal knowledge of the relationship. Brent Snyder Dep. 52:20–53:10. Because these assertions are not supported by admissible evidence, they are not included in our analysis.

Plaintiff has offered no evidence to refute or supplement these facts. She has therefore failed to provide an evidentiary basis from which a reasonable juror could conclude that Det. Hession maintained the kind of personal relationships with the suspects that motivated his actions to stifle or prematurely terminate his investigation. Plaintiff possesses no constitutional right to receive police protection or services beyond her right not to be singled-out for unequal treatment. *See DeShaney v. Winnebago Cty. Dep't. of Soc. Serv.*, 489 U.S. 189 (1989). We need not analyze further each of Det. Hession's decisions/actions in search of any conceivable rationality or professional justification, given the total lack of evidence establishing any improper motive. To do so would divert the analysis from whether there was evidence of the *intentional discrimination* required to make a class-of-one claim. *See Olech*, 528 U.S. at 564. We view as more than troublesome the allegation made by Plaintiff that Det. Hession said to her during his interview of her that a young woman may be complicit in a sexual assault of which she was a victim due the length of her shorts or the cut of shirt, and we note as well that Det. Hession has denied making that statement. That is a dispute we cannot and need not resolve. It is enough for purposes of this entry simply to state that our Equal Protection analysis with regard to Det. Hession will end here.

The undisputed facts also reveal that Det. Hession's supervisor, Maj. Albaugh, who was married to the mother of Autumn Dick and that Ms. Dick was at the time of the investigation in a relationship with Boomer Smith, does not give rise to an Equal Protection claim. The additional uncontroverted facts establish that Albaugh was

apparently estranged from Dick at the time, having had no contact with her for several years prior to the investigation, and there is no evidence that he maintained any relationship with Boomer, personal or otherwise. In addition, the evidence before us establishes that Maj. Albaugh's only significant contribution to the investigation was his transport of the rape kit and DNA samples to the state's crime lab for testing—the results of which displayed no signs of tampering and positively identified Boomer Smith as a match.[6] Upon receiving notification of the positive match, Maj. Albaugh ordered Det. Hession to arrest Boomer. From these facts, no reasonable juror could infer that Albaugh acted in this investigation out of personal concern for or relationship with Boomer Smith that resulted in a premature conclusion to the investigation and a decision not to charge him with rape.

Because Plaintiff has failed to provide evidence supporting her allegations that Det. Hession and Maj. Albaugh maintained personal relationships with the suspects, which relationships influenced their behavior in conducting the investigation, her class-of-one equal protection claims against each officer cannot proceed to trial. Accordingly, Defendants are entitled to summary judgment.[7]

---

[6] Although Plaintiff has noted that Maj. Albaugh was Det. Hession's immediate supervisor, she has failed to present any facts which might establish supervisor liability under 42 U.S.C. § 1983; thus, we have addressed only Maj. Albaugh's personal involvement in the investigation as it relates to Plaintiff's individual capacity claim against him.

[7] Defendants also include Chief Troy Bacon, who Plaintiff concedes in her briefing should be dismissed from this case. See Dkt. 129 at 1.

**Conclusion**

For the reasons detailed above, we **GRANT** Defendants' Motion for Summary Judgment. [Docket No. 114]. Final Judgment shall enter accordingly.

IT IS SO ORDERED.

Date: 9/7/2016

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Matthew J. Elkin
melkin1@sbcglobal.net

David Lawrence Whitsett, II
david@whitsettlaw.com

Alex Maurice Beeman
BEEMAN LAW
alex@beemanlawoffice.com

Andrea Lynn Ciobanu
CIOBANU LAW, PC
aciobanu@ciobanulaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Ronald J. Semler
STEPHENSON MOROW & SEMLER
rsemler@stephlaw.com

Rosemary L. Borek
STEPHENSON MOROW & SEMLER
rborek@stephlaw.com